FRANK VAN CLEVE AND THE MAYOR AND ALDERMEN OF THE CITY OF PATERSON, PROSECUTORS, v. PASSAIC VALLEY SEWERAGE COMMISSIONERS.

Argued November 9, 1903—Decided July 23, 1904.

1. · The act of March 27th, 1902, entitled "An act to create a sewerage district to be called the Passaic valley sewerage district" (*Pamph. L., p.* 190), is not unconstitutional.

2. The act of April 22d, 1903, entitled "An act to relieve from pollution the rivers and streams within the Passaic valley sewerage district," &c. (*Pamph. L., p.* 777), is not violative of paragraph 11 of section 7 of article 4 of the amended constitution, which prohibits the passage of private, local or special laws: (*a*) laying out, opening, altering and working roads or highways; (*b*) vacating any road, town plot, street, alley or public grounds; (*c*) regulating the internal affairs of towns and counties, appointing local offices or commissions to regulate municipal affairs.

3. The act of April 22d, 1903 (*Pamph. L., p.* 777), is not violative of that clause of paragraph 11 of section 7 of article 4 of the amended constitution, which declares that "the legislature shall pass no special act conferring corporate powers," &c. This prohibition does not relate to the creation of political corporations.

4. The Passaic Valley Sewerage District is not established as a municipal corporation.

5. The powers conferred upon the Passaic Valley Sewerage Commissioners are executive and administrative in character, and not legislative.

6. In providing for the establishment, maintenance and operation of public works in order to relieve the natural streams from ↳pollution detrimental to the health of the neighboring population, the legislature is not required by any constitutional limitation to delegate the work to existing municipalities, nor to establish a new municipality for the purpose, but may act directly and through its own agencies.

7. It is not a constitutional right of the people to have all matters of local concern entrusted to municipal corporations. Within

constitutional limits the people of the state, acting through the general legislature, may delegate to the municipalities such portion of political power as they may deem expedient, may withhold other powers and may withdraw any part of that which has been delegated.

8. In the mandatory clause of paragraph 11 of section 7 of article 4 of the amended constitution, declaring that "the legislature shall pass general laws providing for the cases enumerated in this paragraph, and for all other cases which, *in its judgment*, may be provided for by general laws," the latter part of the clause leaves much to the discretion of the legislature. Under this language it would require at least a plain case, amounting in effect to an evasion of the legislative duty, to justify the courts in declaring an act void for want of generality.

9. The situation of the territory included within the Passaic Valley Sewerage District, in respect to the features that have necessitated the legislation in question (*Pamph. L.* 1903, *p.* 777), is wholly exceptional; no parallel to it exists elsewhere in the state at present, nor is it reasonable to anticipate that such a situation will elsewhere exist in the near future.

10. A law is special, in a constitutional sense, when by force of an inherent limitation it arbitrarily separates some persons, places or things from those upon which, but for such separation, it would operate.

11. The rule adopted in determining the constitutional validity of a classification of municipalities on the basis of population—the rule that municipalities afterwards "growing into the class" must be brought under the operation of the law in question—has no applicancy to the anomalous conditions that have necessitated the legislation under review (*Pamph. L.* 1903, *p.* 777), it being not reasonable to anticipate that the natural streams in other parts of the state will be permitted to become polluted to the extent of endangering the public health.

12. The act under review (*Pamph. L.* 1903, *p.* 777) being constitutional in its main purpose of establishing and regulating a sewerage district, such of its provisions as incidentally regulate the internal affairs of existing municipalities in order to carry out the main purpose are not invalid as being special legislation, since the municipalities thus affected are thrown into a class by themselves, from the very necessity of the case, and no distinctions are made between these several municipalities except such as are germane to the purposes of the legislation.

13. The act under review (*Pamph. L.* 1903, *p.* 777) is not unconstitutional in imposing the cost of the public work thereby established upon a limited district, rather than upon the state at large.

14. The rule enunciated in *State, Baldwin, pros., v. Fuller*, 10 *Vroom* 576; 11 *Id.* 615, that the legislature may not create a taxing district narrower in extent than the political district of which it is a part, has no applicancy to a taxing district that includes the whole of certain political districts and parts of

others, and where the taxes in question are imposed not by any delegated authority, but by the legislature itself.

15. The act under review (*Pamph. L.* 1903, *p.* 777) does not delegate to the Passaic Valley Sewerage Commissioners the *legislative* function of *levying* taxes, but only the administrative function of assessing and collecting the taxes laid by the legislature in the act.

16. The acts under which the city of Paterson was authorized to empty its sewage into the Passaic river amount merely to a legislative license, revocable at the will of the legislature, at least, whenever the public health and safety require.

17. Article 4, section 7, paragraph 4 of the constitution, declaring that the legislature shall not create any debt or liability of the state, exceeding $100,000, without the previous approval of the people at a general election, has no applicancy to municipal indebtednesses.

On *certiorari.*

Before Justices FORT, GARRETSON and PITNEY.

For the prosecutors, *John W. Griggs, William B. Gourley, Michael Dunn* and *Thomas C. Simonton.*

For the defendants, *Joseph Coult, Chandler W. Riker* and *Richard V. Lindabury.*

The opinion of the court was delivered by

PITNEY, J.  This writ of *certiorari* brings under review two resolutions passed by the Passaic Valley Sewerage Commissioners on the 7th day of July, A. D. 1903, one estimating the cost and expense of the whole work to be undertaken and constructed by them, under statutory authority, at the sum of $9,000,000, and another resolution, by which they have determined upon a present issue of bonds to the amount of $1,000,000, in order to provide money for the payment of the costs and expenses to be incurred in the purchase of land and the construction of the works in question.  The prosecutor Van Cleve is the owner of real estate in the city of Paterson which has been subjected to assessment for special benefits by reason of the building of one of the sewers heretofore constructed by the municipal authorities of that city. The other prosecutor is the municipal corporation of Paterson.

They attack the proceedings of the commissioners by asserting the unconstitutionality of two acts of the legislature that form their statutory basis. One of these is chapter 48 of the laws of 1902, which created the Passaic Valley Sewerage District. *Pamph. L., p.* 190. The other is an act, approved April 22d, 1903, which authorized certain public works to be established and maintained for the benefit of that district by the defendant commissioners. *Pamph. L., p.* 777.

The former act declares that certain territory, particularly described by metes and bounds therein and comprising portions of Essex, Passaic, Bergen and Hudson counties, shall be constituted a sewerage district under the name of Passaic Valley Sewerage District, and "shall be entitled to all of the authority and shall be subject to all the laws of this state concerning sewerage districts so created."

On the date of its approval there was also approved a companion measure (*Pamph. L.* 1902, *p.* 195), which authorized the governor to appoint five residents of such district as commissioners, who were required to investigate methods and plans for relieving the streams and rivers within the district from pollution, and for preventing the pollution thereof, and to report a plan or method, when adopted by them, to the legislature. Pursuant to this act the governor appointed five commissioners for the Passaic Valley Sewerage District, who reported to the legislature a plan for accomplishing the purposes just indicated.

The legislature, at its next regular session, passed an act (*Pamph. L.* 1903, *p.* 158) for the purpose of carrying into effect the recommendations of the commissioners. Because of defects in this act, not necessary to be now mentioned, the legislature was convened in special session on the 21st of April and enacted (as a substitute) the statute whose provisions form the principal subject of the present controversy. *Pamph. L.* 1903, *p.* 777. This act is entitled "An act to relieve from pollution the rivers and streams within the Passaic valley sewerage district, established and defined by an act of the legislature entitled 'An act to create

a sewerage district, to be called the Passaic valley sewerage district,' approved March twenty-seventh, one thousand nine hundred and two, and for this purpose establishing therefor a district board of commissioners, defining its powers and duties and providing for the appointment, terms of office, duties and compensation of such commissioners, and further providing for the raising, collecting and expenditure of the necessary moneys." Its preamble recites that the legislature has created and defined a sewerage district, embracing a large number of municipalities and parts of municipalities in the counties of Passaic, Bergen, Hudson and Essex, under the name of the Passaic Valley Sewerage District; that the Passaic river and many streams flowing into it within said district are polluted by sewage and other deleterious matter to such extent that the health of the people residing in said district is seriously endangered; and that immediate relief therefrom is imperative; recites the previous appointment of commissioners to investigate methods and plans, and the adoption by them and report to the legislature of a plan or method, as already mentioned; and declares that in order to carry into effect such plan or method, with such modifications or additions thereto as shall hereafter be approved by said commissioners, it is necessary that further and greater power be given the said commissioners. It thereupon proceeds to provide by enactment for the continuance in office of the commissioners already appointed, and for the appointment of successors when their terms expire, or when vacancies otherwise occur. It constitutes these commissioners and their successors a body politic and corporate, with perpetual succession, under the name of "Passaic Valley Sewerage Commissioners," with general corporate powers, and with specific power and authority to construct, maintain and operate intercepting, main, trunk and outlet sewers, with the necessary pipes, conduits, pumping works and other appliances for the purpose of taking up within the said district the sewage and offensive and deleterious matter which would or might otherwise pollute the streams and rivers in said district, and conveying the same to some proper place or places of deposit,

discharge or outfall in New York bay, within the State of New Jersey, to be selected by the commissioners, there to be discharged; it approximately locates the place or places of discharge or outfall for such sewage, and authorizes the commissioners to establish within said district, when necessary, sewage disposal works; it requires that all work done and materials furnished in the prosecution of said work or works, the cost of which shall exceed $5,000, shall be let by contract to the lowest bidder after advertisement.

The act makes it the duty of all persons, corporations and municipalities owning or controlling sewers or drains, within the limits of the district, which discharge directly or indirectly into the streams or rivers, to cause the same to be connected with and to be discharged into the sewers constructed by the commissioners, and requires that all sewers and drains hereafter constructed by any person, corporation or municipality within the district, which might otherwise discharge into the streams or rivers, shall be so constructed that the discharge therefrom shall be delivered into the drains or sewers provided by said commissioners, at the points and places to be designated by them; it being made the duty of the commissioners, in constructing intercepting or main sewers, to have them so constructed that connection therewith can be made at necessary or proper points.

The act provides that the main, intercepting or trunk sewer to be constructed by the commissioners shall commence at or near the valley of rocks, in the city of Paterson, and shall extend to the point of discharge or outfall in New York bay, within the limits of the State of New Jersey. It requires that before any moneys are expended, or obligations incurred for the construction of any trunk or outlet sewer, which shall discharge into New York bay, the commissioners shall investigate whether such discharge is likely to pollute the waters of that bay within the jurisdiction of the State of New York to such extent as to cause a nuisance to persons or property within that state, and shall present the result of such investigation to the governor with their opinion thereon; whereupon the same is to be considered by the

governor and the attorney-general, and no work is to be done, or further proceedings taken, unless the attorney-general shall, in writing, advise that no cause of action, either for damages or an injunction, will arise in favor of the State of New York, or any of its inhabitants, by reason of such discharge of sewage into the waters of New York bay, and the governor shall, by order in writing, advise said board that, in his judgment, it is safe and prudent to proceed with its work, due regard being had to all the risks and dangers of injunctive litigation.

It may be mentioned, in passing, that the return made to the writ of *certiorari* herein shows that these conditions have been complied with, and by stipulation of the parties it is made to appear that "the question of pollution, or the extent of pollution by the sewerage commissioners through their proposed construction in the waters of New York bay, is not at issue."

The act further provides that the sewerage commissioners shall have power and authority to purchase and acquire lands and rights or interests in lands, within or without the sewerage district, for the construction of sewers, drains, disposal, pumping or other works authorized by the act, with power to condemn in case of disagreement with the owners. The commissioners are authorized to construct any sewer or drain under or over any water course, under or over or across or along any street, turnpike, railway, canal, highway or other way, and in or upon private or public lands, and upon lands of this state and under waters of this state, and to enter upon and dig up any street, road, highway or private or public lands, either within or without the sewerage district, for the purpose of constructing, maintaining and operating sewers or drains upon or beneath the surface thereof. They are also given power to alter water courses, and, with the consent of the municipal authorities, to alter or change the grade or location of any highway, public street or way crossed by any sewer or drain to be constructed under the provisions of the act.

The commissioners are required to keep full and accurate

accounts of their receipts, disbursements and liabilities, reporting annually to the secretary of state and to the clerk of each municipality within the district.

The act declares, in its eleventh section, that in order to provide for the payment of costs and expenses incurred or to be incurred by the commissioners for the purchase of lands and other property, and for the construction of its works and expenses connected therewith, the commissioners shall have power, from time to time, to issue corporate bonds in an amount not exceeding $9,000,000, and not exceeding the total estimated cost and expenses of the whole work; the bonds to run not exceeding fifty years from date, and to be otherwise in such form and payable at such time and place as the commissioners may determine, bearing interest not exceeding four per centum per annum. By the same section the commissioners are required to keep the cost and expense of the construction of its plant separate from the cost and expense of maintenance, operation and repairs. Section 12 authorizes them to issue temporary certificates of indebtedness, to be retired from the proceeds of bonds when issued, and to provide a sinking fund, to be raised from year to year in the same manner as moneys necessary to pay the interest on the bonds are to be raised. By section 13 it is declared that all indebtedness of the commissioners incurred pursuant to the provisions of the act, with the interest thereon, shall be a charge upon all persons and property in the municipal or taxing districts lying in whole or in part within said sewerage district as fully as the legislature shall have power to authorize the same.

By section 14 the commissioners are required, on or before the 15th day of June in each year, to ascertain and determine the money necessary to be raised for the payment of interest upon bonds and other indebtedness, and for sinking fund charges, and to apportion the same among the respective municipalities and taxing districts lying in whole or in part within the sewerage district in such proportion as the taxable ratables within so much of said municipality or taxing district as is embraced within the sewerage district bears to the total

amount of taxable ratables within the whole sewerage district, as returned and certified by the respective taxing boards and taxing officers of said municipalities or taxing districts for the preceding years; provided, that all ratables in the district for this purpose shall be assessed at their true value; and it is made the duty of each assessor, taxing board or taxing officer for the several· municipalities and taxing districts lying in whole or in part within said sewerage district for this purpose to compute, determine and certify to the sewerage board annually, by the first day of April, the amount of taxable property or ratables within so much of the several municipalities and. taxing districts as lie within the sewerage district. By section 15 the commissioners are required annually, on or before the 15th day of June, to ascertain and determine the amount of money necessary to be raised for operating, maintaining and repairing the works and plant for the current fiscal year, and to apportion the money so estimated to be necessary among the several municipalities or taxing districts lying in whole or in part within the sewerage district, according to the amount of sewage by them, respectively, delivered to or discharged into any sewers or other receptacles provided or constructed by the commissioners for the reception thereof. The commissioners are to grant a hearing to the several municipalities upon the question of this apportionment, and the apportionment when made by the commissioners is declared to be final and conclusive, provision being made at the same time for adjustment of any deficiencies and excesses in the annual estimates by adding or deducting the same in making up the estimates for the following year.

By section 16 the commissioners are required, on or before the 20th day of June in each year, to order and cause a tax to be levied and assessed upon all persons and property within each of the municipalities and taxing districts lying in whole or in part within the sewerage district, for the purpose of raising the money necessary to pay interest and sinking fund charges, and to provide for the proper maintenance and operation of the works and plant and for all other expenses of. the commissioners; and to this end the commissioners are

to certify to the tax assessor, taxing board or taxing officer of each municipality or taxing district lying within the sewerage district the amount of tax required to be levied, assessed and raised in each of the respective municipalities and taxing districts; and the assessors, taxing boards and taxing officers are required to assess these sums upon all the persons and property within their respective municipalities or taxing districts liable to be assessed for state or county taxes, and the tax is to be levied, assessed and collected by the same officers, at the same time and in the same manner and with the same effect, as state or county taxes are required to be levied, assessed and collected; and the taxes so levied upon real estate are to be and remain a first and paramount lien thereon until paid. By section 17 it is made the duty of the disbursing officer of each municipality or taxing district, out of the first moneys collected and not required by law to be paid to the county collector for state or county purposes, to pay to the treasurer of the sewerage commissioners the moneys directed by the commissioners to be assessed, levied and collected in such municipality or sewerage district. By section 18 the commissioners are authorized to borrow money in anticipation of taxes.

By section 19, in case the streams and rivers within the said sewerage district are polluted by sewage or other deleterious matter discharged therein, directly or indirectly, from any municipality lying without the district, contracts are authorized to be made between such municipalities and the board of commissioners for the disposal of such sewage and other deleterious matters, and the commissioners are authorized to make provision for such disposal in the construction of their works. Such municipalities are authorized to raise the agreed annual consideration payable for this privilege by tax, and the moneys received by the commissioners under such contracts are to be applied—two-thirds to the payment of interest upon their bonds and one-third to the payment of the expense of operation, maintenance and repair of the works.

By section 20 the sewerage commissioners are given power

within the sewerage district, exclusive of all other boards, to protect the rivers and streams from pollution and to prevent the pollution of the same, and for this purpose to prohibit the discharge of sewage and other polluting matters into the rivers and streams; and to apply by bill or petition to the Court of Chancery for relief by injunction.

This outline of the provisions of the act may be concluded with the mention that its twenty-third section declares that in case, for any reason, any section or any provision of the act shall be held to be unconstitutional or invalid, the same shall not be held to affect any other section or provision of the act.

The first ground assigned by the prosecutors for setting aside the proceedings under review is that chapter 48 of the laws of 1902 (*Pamph. L., p.* 190), whereby the Passaic Valley Sewerage District was created, is unconstitutional, because it is a local and special law, regulating the internal affairs of towns and counties. This objection was not pressed in argument, and in our opinion is unsubstantial. The act contains no regulative provisions whatsoever beyond a declaration that the district shall be entitled to all of the authority and subject to all the laws concerning sewerage districts so created. This amounts to no more than an expression of the purpose for which the district was delimited, and does not of its own force establish any regulation for its government. Even as to municipal corporations (the district, as we shall see, is not such) the constitution does not require that their *creation* shall be by general laws, a point that after remaining undetermined for some time (*Pell* v. *Newark,* 11 *Vroom* 71 (at *p.* 77); *S. C. in error, Id.* 550, 553, 555; *Long Branch* v. *Sloane,* 20 *Id.* 356 (at *p.* 362); *Dempsey* v. *Newark,* 24 *Id.* 4 (at *p.* 11); *State* v. *Borough of Clayton, Id.* 277 (at *p.* 279); *Lakewood* v. *Brick,* 26 *Id.* 275 (at *p.* 277); *Glen Ridge* v. *Stout,* 29 *Id.* 598) was set at rest, so far as this court is concerned, by *Miller* v. *Greenwalt,* 35 *Id.* 197. And in *Riccio* v. *Hoboken,* 40 *Id.* 649 (at *p.* 662), it was said in the Court of Errors and

Appeals: "We are not prepared to say that the legislature may not by special act create a school district, just as they create new municipalities, by the delimitation of a specified portion of the area of the state for that purpose." The practice of establishing boroughs by special acts of incorporation has been followed by the legislature since the enactment of the General Borough law of 1897. *Pamph. L., p.* 285. It is, indeed, quite obvious that any course of procedure— be it by legislative enactment or otherwise—that has as its end and object the setting apart of any portion of the state's territory from the remaining portions thereof for any governmental purpose, must in the last analysis be specific, and, in that sense, special and local. Even though some tribunal subordinate to the legislature be established by general law for the determination of the boundary lines of a new municipality or other governmental division, the delegated power must be specifically exercised in every given instance. Thus, the power given to township committees to divide the township into districts for certain local purposes (where authorized by the legislature) eventuates, when exercised, in a specific—and in that sense special and local—act establishing a municipality or *quasi* municipality. Such a legislative delegation of power was declared constitutional by the Court of Errors and Appeals in *Allison* v. *Corker,* 38 *Vroom* 596, 604. What may thus be done under a power delegated by the legislature may, of course, be done by the legislature itself.

We therefore have no doubt of the constitutionality of chapter 48 of the laws of 1902, which establishes the Passaic Valley Sewerage District.

Were we of a different opinion upon this point, it would make no difference in the result. The geographical district would be recognized (*Mortland* v. *Christian,* 23 *Vroom* 521; *Van Vane* v. *Centre Township,* 38 *Id.* 587, 589), and the case must still turn upon the constitutionality of the act of April 22d, 1903 (*Pamph. L., p.* 777), whose provisions are above recited at length.

To this act the argument for the prosecutors was solely addressed. It is first attacked as violative of paragraph 11

of section 7 of article 4 of the amended constitution, which
(*inter alia*) prohibits the passage of private, local or special
laws: (*a*) regulating the internal affairs of towns and coun-
ties; (*b*) appointing local offices or commissions to regulate
municipal affairs; (*c*) conferring corporate powers.

To deal with the last of these points first: In *Pell* v.
*Newark,* 11 *Vroom* 71 (at *p.* 76), it was said by Justice
Van Syckel, for reasons that we deem conclusive, that the
prohibition of special laws conferring corporate powers has
reference only to private corporations. The same view was
adopted and made the basis of the decision of Vice Chan-
cellor Stevens in *State Board of Health* v. *Diamond Mills
Paper Co.,* 18 *Dick. Ch. Rep.* 111, 114, whose opinion was
adopted by the Court of Errors and Appeals in affirming the
decree. 19 *Dick. Ch. Rep.* 793.

In dealing with the act in reference to the constitutional
interdict of special legislation regulating municipal affairs,
we may inquire—*first,* whether the powers conferred upon the
commissioners are municipal powers; *secondly,* whether the
act in its main features is a special act, within the prohibition
of the fundamental law; and if not, then *thirdly,* whether
the provisions of the act, so far as they incidentally regulate
the internal affairs of municipalities already established, are
to be characterized as special legislation in that behalf.

The main purpose of the act is to establish, within and for
a designated portion of the area of the state, a great public
work for a great public purpose, which work is to be estab-
lished, maintained and operated through the instrumentality
of an administrative branch of the central government of the
state, at the cost of the present and future residents of the
district particularly affected, by means of taxation of the
property, real and personal, within that district.

In effect, the act declares that the Passaic river and other
natural streams within the district are so polluted by sewage
and other deleterious matter as to be a menace to the health,
not to mention the comfort, of the population. For practical
purposes, the act treats this situation as a public nuisance.
To the extent that the polluting materials proceed from

municipal sewers that by legislative license are permitted to be discharged into the river, it would of course be inaccurate to describe the resulting pollution as a nuisance in law, so long as the license remains unrevoked.  One of the chief objects of this act is to revoke the legislative authority previously given to the municipalities in that behalf.  The right of revocation is a controverted point in the present case, to be dealt with in its order.  But a material part of the river pollution proceeds from sources independent of the municipal sewers, and not covered by any legislative authority.  To this extent there is, or may be, nuisance in law.

But, as we take it, the validity of the statute does not depend upon whether the conditions existing in the lower valley of the Passaic are attributable to the exercise of lawful rights by municipalities or individuals, or are due to unauthorized pollution of the river.  The act deals with a practical situation.  It proposes a compulsory cleansing of the river, to be accomplished by first constructing an artificial channel to carry the polluting materials to the sea, and then requiring that this channel be used instead of the natural stream.  And this is to be done, not by delegating the work to the municipality or municipalities that happen to be chiefly concerned, nor by erecting a new municipality for the purpose, but by direct intervention of the central authority in the state.

The powers conferred upon the sewerage commissioners are executive and administrative in their character.  The commissioners are constituted by section 3 a body politic, with the essential powers of corporations, and by section 21 they are authorized to make rules and regulations for the use, protection and management of the works, property and plant, and for the protection of the rivers and streams within the district from pollution; beyond this, the commissioners have no legislative powers.  By section 15 they are required to give a hearing to the municipalities affected upon the question of the apportionment of the cost of maintenance, operation and repair of the plant.  This, of course, is a *quasi*-judicial function, similar in character to that which is fre-

quently imposed upon boards and officers having to do with the assessment and adjustment of taxes. And while the same section declares that the apportionment when made by the commissioners shall be final and conclusive, this is manifestly subject, on constitutional grounds, to the review of the Supreme Court by *certiorari*. For all essential purposes, the corporate body created by this act is but an executive and administrative branch of the state government, charged with the duty of carrying out in detail a work that the lawmaking body has determined to establish and maintain for the good and welfare of the citizens of the state, and especially of those residing within the sewerage district. The powers of this board are closely analogous to those conferred upon the boards created for the establishment and maintenance of state hospitals for the insane and other public establishments of like character.

To call this sewerage district, or the commission that is put in charge of this work, a municipal or *quasi*-municipal corporation is, we think, a misuse of terms. There is lacking the delegated power of legislation for local purposes, which is of the essence of municipal government. 2 *Kent Com.* \*275. There is also lacking the direct and exclusive voice of the people locally concerned, so common in our municipalities. Some of our judicial decisions, indeed, have almost treated the right of local *self*-government as essential to the definition of a municipal corporation (*State, Lydecker, pros.,* v. *Englewood,* 12 *Vroom* 157; *Allison* v. *Corker, Assessor,* 38 *Id.* 606), but so far as observed this point has not been necessarily involved in the cases. Self-government in municipal affairs is so well nigh universal in this country that it is sometimes thought of as a constitutional right, but perhaps it is not, in the absence of express constitutional provision. See 1 *Dill. Mun. Corp.* (*4th ed.*), §§ 9, 19, 20, 21, 44, 58*a,* 60, 61, 183, and elsewhere *passim.* Our own constitution now contains an express prohibition against *special or local* laws for "appointing local offices [*sic*] or commissions to regulate municipal affairs," which seems to imply the legislative power to enact *general* laws for these purposes.

We therefore base our view that the Passaic Valley Sewerage Commission is not by this legislation made a municipal corporation, rather upon the absence of the political and legislative power that seems to be an essential faculty of municipal corporations, than upon the absence of local self-government. *Dill. Mun. Corp.* (*4th ed.*), §§ 19, 20.

The question then arises whether the legislature is debarred by any constitutional limitation from carrying out the objects aimed at in this legislation by any instrumentality other than the establishment of a municipal corporation or corporations for the purpose. Must work of this character be confided to the municipalities? Is the legislature impotent to act directly, and through its own chosen agencies, merely because its plans have reference to a limited portion of the state's area, where the emergency requires their adoption? It seems to us these questions must be answered in the negative. It is not, in our opinion, a constitutional right of the people to have all matters of local concern entrusted to municipal corporations. Within constitutional limits the people of the state, acting through the general legislature, may delegate to the municipalities such portion of political power as they may deem expedient, may withhold other powers and may withdraw any part of that which has been delegated. *Mount Pleasant* v. *Beckwith,* 100 *U. S.* 514; 20 *Am. & Eng. Encycl. L.* (*2d ed.*), tit. *"Municipal Corporations,"* p. 1218 *et seq.*

The constitutional prohibition of special legislation is absolute with respect to that which "regulates the internal affairs of municipalities." But the word "internal" here means governmentally, not territorially internal. Such matters of local government as are confided to the municipalities at once become, and until recalled remain, their "internal affairs." But it is not every matter of governmental regulation, local in its effect when territorially considered, that is an "internal affair" of the municipality within the meaning of the constitutional interdict; otherwise there would have been little need for the accompanying prohibition of special laws relating to roads, public

grounds, drawing jurors, changing the law of descent, granting the right to lay down railroad tracks, providing for the management and support of free public schools, &c.

So far as the present act operates upon the several municipalities that lie within the sewerage district, it will be dealt with presently. We are at the moment considering the district as a separate governmental establishment. So far as the act regulates the district as a district, and the proposed sewage disposal system, it does not regulate the "internal affairs" of a municipality, for the district is not established as a municipal corporation.

But after enumerating specified topics upon which special legislation is absolutely prohibited, the constitutional amendment in question proceeds as follows: "The legislature shall pass general laws, providing for the cases enumerated in this paragraph, and for *all other cases* which, *in its judgment,* may be provided for by general laws." The latter part of this clause plainly leaves much to the discretion of the legislature. It implies that there are matters of local concern other than those especially enumerated in the paragraph; and with respect to such others it is left to the legislature to determine in its judgment whether they can be reached by general enactments. Under this clause it would require, at least, a plain case, amounting in effect to an evasion of the legislative duty, to justify us in declaring an act void for want of generality. *State* v. *Price, post p.* 249, recently decided by this court.

But is the act before us "local or special" within the constitutional interdict, even as relates to the establishment and regulation of the sewerage district as such? The fact that it applies in terms and by name to the Passaic Valley Sewerage Commission, and cannot without amendment be made applicable to any other commission of the same sort, is not controlling. If it applied in terms to "all sewerage commissions," its effect would be precisely the same so far as present conditions are concerned, there being in fact no other territory established as a sewerage district, nor any other commission to which the act could apply. It is the sub-

stance and not the form of the enactment that is to be looked to. *Rutgers* v. *New Brunswick*, 13 *Vroom* 51 (at *p*. 54).

In *Van Riper* v. *Parsons*, 11 *Vroom* (at *p*. 6), Chief Justice Beasley said: "In my opinion, the clause in question seems to have been provided with the intention to require that for the future all legislative regulation of the internal affairs of cities should be the creatures, *whenever practicable*, of general laws framed for the purpose. This is a domain from which special and local legislation is utterly excluded *whenever the legislative end can be effected by a general law*."

In the same case, at a later stage (11 *Vroom*, at *p*. 125), Justice Dixon, speaking for this court, declared that a law is not prevented from being a general law by the mere consideration that within the state there happens to be but one individual of the class or one place where it produces effects.

In *Pell* v. *Newark*, 11 *Vroom* (at *p*. 79), Justice Van Syckel said: "In Van Riper *v*. Parsons this court has held that the clause of the constitution in question was *not intended to limit legislation*, but to *forbid only the doing by special or local laws those things that can be done by general laws.* * * * Assuming that this law is vicious, *if the same end could be attained by general legislation*," &c.

In *Sutterly* v. *Camden Common Pleas*, 12 *Vroom* (at *p*. 496), Justice Knapp said: "The general effect of the clause in question was declared (in Pell *v*. Newark) to be to take away from the legislature the control of municipal affairs in these political divisions, through the instrumentality of local and special laws, *in all cases where the subject-matter was not in its nature necessarily local and special*," &c.

In *Budd* v. *Hancock*, 37 *Vroom* (at *p*. 135), Justice Garrison said: "A law is special in a constitutional sense when, by force of an inherent limitation, it *arbitrarily separates some persons, places or things from those upon which, but for such separation, it would operate.* The test of a special law is the appropriateness of its provisions to the objects that it excludes. *It is not, therefore, what a law includes that makes it special, but what it excludes.* If nothing be excluded that should be contained the law is general."

It is important, therefore, that we determine whether the act in question *arbitrarily* establishes a peculiar system of sewage disposal for the valley of the Passaic and *arbitrarily* imposes restrictions and regulations upon the municipal cor- ·porations within its reach. The prime element for consider- ation is the practical condition out of which arises the neces- sity for the legislation under review. Is the situation of the district in question, with respect to the pollution of natural streams by sewage, with respect to the injurious consequences resulting therefrom, and with respect to the engineering and fiscal problems that are to be solved in order to reach a satis- factory remedy, similar to conditions which exist in other parts of the state or which may reasonably be anticipated to exist elsewhere in the near future? This question is funda- mentally a question of fact, or at least depends for its solution upon questions of fact. The facts pertinent to the inquiry are evidenced in part by legislative declarations, offi- cial documents and other data of a public character, and in part are contained in a stipulated state of facts agreed upon by the parties to these proceedings. Where the constitu- tionality of an act of the legislature is in question, it is important that the basis of fact necessary for the determi- nation of the question should not rest upon consent of parties, for no consent of parties should be given such an effect as will overthrow or nullify an act of the legislature. Fortu- nately the stipulated facts in the present case relate princi- pally to matters of geography, topography, population, river flow and other matters that are in some instances of common knowledge, in other instances of public record, and in all respects quite indubitable.

The public records of the state and the acts of the legis- lature show that the question of the pollution of the Passaic river resulting from sewage has been the subject of anxious consideration by the executive and legislative departments for at least eight years past. The legislature of 1896, among its earliest acts, passed one entitled "An act for the consid- eration of a general system of sewage disposal for the valley of the Passaic river and the prevention of the pollution

thereof." (*Pamph. L.* 1896, *p.* 20), whereby the governor was authorized to appoint three commissioners to consider the subject of the pollution of that river and a general system of sewage disposal for the relief of the valley of the Passaic, who were required to report their conclusions to the legislature without unnecessary delay, together with maps and plans of the territory to be drained, methods of executing the work, an estimate of its cost and a recommendation as to the method of apportioning such cost. The governor appointed a commission pursuant to this act, who made a report one year later, and this report was referred by the governor to the legislature, he recommending the adoption of its proposals, which included the construction of a system of trunk sewers leading from the falls at Paterson to the meadows below Newark. In January, 1898, the matter was again brought by the governor to the attention of the legislature. Thereupon an act was passed entitled "An act authorizing the appointment of commissioners to consider the subject of the pollution of the rivers and streams within this state, to provide a plan for the prevention thereof, and for the relief of the persons and property affected thereby, and to provide for the expenses necessary for that purpose." *Pamph. L.* 1898, *p.* 233. This act provided for the appointment of a commission to consider the subject of the pollution of any stream within the state, and it was made their duty, after having duly investigated the cause, character and extent of such pollution, if they should deem it necessary and expedient, to prepare and present a plan for its prevention. The commissioners were authorized to raise and expend for the purposes of the act a sum not exceeding $25,000. A year later another act was passed, entitled "An act to prevent the pollution of the waters of this state by the establishment of a state sewerage commission, and authorizing the creation of sewerage districts and district sewerage boards," &c. *Pamph. L.* 1899, *p.* 536. While the latter two acts in terms referred to river pollution wherever it might be found in any part of the state, it is a matter of common knowledge, abundantly evidenced by official records, that the exciting

cause which produced their enactment was the extreme pollution of the waters of the Passaic river. This matter was made the subject of special mention in the message of the governor at the opening of the session of 1900, whereupon the legislature enacted a supplement to the act of 1899 (*Pamph. L.* 1900, *p.* 113), further defining the powers and duties of the state sewerage commission. For two years longer the agitation continued, being the subject of repeated representations made by the executive to the legislature, and in 1902, as already mentioned, two acts were passed with especial reference to conditions in the Passaic valley—one (chapter 48) being "An act to create a sewerage district to be called the Passaic valley sewerage district" (*Pamph. L.* 1902, *p.* 190), and the other, being chapter 49, entitled "An act authorizing the appointment and defining the powers and duties of commissioners of sewerage and drainage districts," &c. *Pamph. L.* 1902, *p.* 195. Finally, in 1903, the problem of the drainage of the Passaic had become so pressing and the dangers resulting from further neglect so imminent, that the legislature was convened in special session, having for its only business the enactment of the law now under consideration. *Pamph. L.* 1903, *p.* 777.

A reference to the map of the Passaic Valley Sewerage District, and a consideration of its geographical and topographical features, and of the population therein contained, render it plain that the repeated efforts of the executive and legislative departments to grapple effectively with this problem are based upon an actual condition of affairs that is not overstated in the preamble of the act now under consideration.

The district comprises parts of the counties of Passaic, Bergen, Hudson and Essex, and includes the whole or parts of the territory of the following municipalities that naturally drain into the Passaic river, viz., the whole of the city of Paterson, the city of Passaic and the township of Acquackanonk, in the county of Passaic; the borough of Garfield, the borough of Wallington, and parts of the boroughs of East Rutherford, Rutherford and North Arlington, and part of the

township of Union, in the county of Bergen; nearly the whole of the territory of the city of Newark, all of Orange, East Orange, the town of Bloomfield, the borough of Glen Ridge, the town of Montclair, the township of Belleville and the town of Nutley, in the county of Essex; and the borough of East Newark, the town of Harrison and part of the town of Kearney, in the county of Hudson. At the upper part of the district, and immediately adjacent to the river, lies the city of Paterson, with more than one hundred thousand population, and with numerous silk mills, dye houses and other manufacturing establishments. Near by lies the city of Passaic, with twenty-seven thousand eight hundred population. Near the central part of the district are Montclair, Bloomfield, Belleville and the Oranges, with nearly seventy thousand population within the district. And further down the stream and adjacent to the river are the city of Newark and that portion of Hudson county which lies within the district, having an aggregate population of over two hundred and fifty thousand within the district. The water at the Little Falls of the Passaic river, four miles above the Great Falls, is potable, and is used for the purpose of supplying the city of Paterson and other towns and cities for drinking purposes. The material pollution of the river begins at Paterson and increases continuously as the river runs toward the sea. In addition to the ordinary pollution, inevitably incident to the existence of so dense a population located upon territory that naturally drains into the river, the cities of Paterson, Passaic, Orange, East Orange and Newark maintain systems of municipal sewers which discharge their outflow directly into the river. The other municipalities within the district contribute pollution in the same manner to an extent approximately proportionate to their population. We can well believe the facts admitted in the stipulation that the city of Paterson discharges from its combined sewerage system about seventeen million gallons of sewage per day, and that in addition to this seven million gallons of polluted water are discharged directly into the river from the factories of that city; from the city of Pas-

saic come over two million gallons per day from the sewer system and about seven million gallons per day of polluted water from the factories; from Orange, Glen Ridge, Bloomfield and Montclair come about three million five hundred thousand gallons per day of sewage; from East Orange, two million per day; and from the city of Newark about thirty-four million gallons per day; while the Hudson county municipalities, Harrison, East Newark and Kearny, contribute daily about seven million five hundred thousand gallons of sewage.

The sewer system of Paterson is discharged into the river by legislative authority. *Pamph. L.* 1867, *p.* 653; *Pamph. L.* 1868, *p.* 126; *Pamph. L.* 1871, *p.* 808. This legislative permission has been acted upon by the city, and has not been revoked prior to the enactment of the present legislation. We are not referred to the statutes (if such there be), in virtue of which the other municipalities within the district discharge the outflow of their municipal sewers directly into the Passaic river. That they do so is admitted, and, indeed, is a matter of common knowledge.

For purposes of comparison with other important drainage areas in the state, the stipulated facts contain statistics concerning the Hackensack, Raritan, Rahway and Elizabeth rivers, and Rancocas creek. We have carefully compared them with the corresponding data respecting the drainage area of the Passaic river and the sewerage district in question. The statistics appear to be derived from public sources and to be of unquestionable reliability. Certainly, the present prosecutors cannot complain if they are fully credited.

The conclusion we have reached, after consideration of all this evidence, especial reference being had to that which is of a public character, is that the situation of the territory included within the Passaic River Sewerage District, in respect to the density of population and the distribution thereof, the character and location of the several municipalities, the amount of sewage matter constantly delivered therefrom into the river and that which may be reasonably anticipated in the future, is entirely abnormal. The flow of the

Passaic river from the head of tidewater to the mouth of the river is especially slow, and the actual pollution of the river flow, and its actual deleterious effect upon the adjacent population, is extreme in degree and wholly exceptional.

We find that in point of fact there is no reasonable basis of comparison between the territory of the Passaic Valley Sewerage District and any drainage district situate elsewhere in the state, with respect to the necessities that have led to the legislation now under consideration. The legislature was well within the facts in declaring that the Passaic river and many other streams within the sewerage district are polluted to such an extent that the health of the people residing in the district is seriously endangered, and that immediate relief therefrom is imperative. No parallel to this situation can be found elsewhere in the state, nor is it reasonable to anticipate that such a situation will elsewhere exist in the near future.

The argument that in other parts of the state there now exist similar conditions that ought to be dealt with in like manner, even if it were based on a correct statement of the fact (which it is not), should be addressed to the lawmaking power and not to the courts. It is for the legislature to decide whether certain territory should be subjected to sanitary and police regulations of the character now under consideration. In their wisdom they have declared that public exigencies require the creation of a sewerage district in the Passaic valley and its regulation by law. We cannot by judicial construction postpone their lawmaking upon the subject until the public needs require the creation of other sewerage districts sufficient to form a "class," in the sense of a group of subjects that may be legislated upon collectively. Classification is essential only for the purpose of differentiating among many individuals, in order that fewer than the whole number may be generalized for the purpose of being treated in groups. But where there is only a single individual, as here—a single established sewerage district—grouping, classification, generalization, are alike impossible.

Nor are they necessary in order to avoid conflict with

the constitution. The purpose of the prohibition against "special or local" laws is not to prevent legislation where there is but one individual to be dealt with. The purpose is to prevent unfounded discrimination where there are two or more individuals to be dealt with.

The learned counsel for the prosecutors, in comparing conditions as they now exist in the Passaic valley with those that may come to exist (as is said) in the other river districts of the state, argues that "whenever the time comes that the same power of prevention is to be exercised as to those other streams, every reason of public policy requires that the same methods of constructive sanitation and internal government should be applied."

But the rule adopted in determining the constitutional validity of a classification of _municipalities_ on the basis of population or the like—the rule that municipalities afterwards "growing into the class" must be brought under the operation of the law in question—seems to us to have no applicancy to the present case, for two reasons:

_First._ Because we cannot say that in respect to the conditions that render this legislation necessary there is any normal progress in other localities that must be now taken into account by the legislature and provided for in advance, so that legislation which fails to do this is for that reason rendered special. In _Cooper_ v. _Springer,_ 36 _Vroom_ 594, the Court of Errors and Appeals had under review an act (_Pamph. L._ 1899, _p._ 534) conferring certain municipal powers in places theretofore organized as boroughs under unconstitutional laws. It was upheld as constitutional, Justice Van Syckel saying (at _p._ 597) : "In reaching this conclusion the fact has not been overlooked that the act applies only to the then existing boroughs of the class to which it relates. The case of _Bennett_ v. _Trenton,_ 26 _Vroom_ 72, and the several cases therein referred to, are instances where the class would in the future, in the ordinary and regular course of events, be increased and added to. This case is not within the reason of the rule which condemned the legislation in those cases. The courts cannot, with proper respect for a co-ordinate

branch of the state government, pronounce a statute infirm on the presumption that the legislature may, in the future, pass unconstitutional laws."

And in *Albright* v. *Sussex County Lake and Park Commission,* 39 *Vroom* 523 (at *p.* 532), it was said of the statute there in question that it "deals with a distinctive topographical feature that is in its nature fixed and not variable. There is no normal change necessarily to be anticipated in the future with respect to the possession by the several counties of the distinctive feature, which the courts can say must be within the contemplation of the legislature, so that a classification not taking it into account would for that reason be special." The reversal of the decision in the Albright case by the Court of Errors and Appeals was based upon grounds that do not affect this portion of the reasoning of this court.

The same reasoning applies to the statute now before us, and with even greater force. It is not reasonable to anticipate that the natural streams in other parts of the state will be permitted to become polluted to the extent of endangering the health of the population residing near their banks. . Such a condition of affairs is entirely anomalous.

*Secondly.* It is a matter of common knowledge that the science of sanitary engineering, as applied to sewage disposal and kindred topics, is in a state of constant progress. Indeed, the brief of the learned counsel for the prosecutors admits as much, for, in arguing the hardship that the adoption of the present plan is claimed to entail upon the city of Paterson, it is said: "The science of sewage disposal still includes several diverse methods, no one of which can as yet be said to be scientifically declared to be the best. Paterson is denied the right to select its own method," &c. Of course, the courts have no control over the question of policy as to which method ought now to be adopted in the given case. The legislature in its wisdom has in this act adopted that system which seems to it best at the present day, the emergency admitting of no longer postponement so far as the Passaic valley is concerned. But the fact that the science

is in a state of flux is a sufficient answer to the argument
that the law before us is special, because it does not require
that the system, now adopted for the Passaic valley, shall at
the same time be adopted for other areas that may become in
need of sewage disposal in the next generation.

We therefore conclude that the act is not "special" within
the meaning of the constitutional interdict, by reason of the
fact that it deals alone with the valley of the Passaic, and
establishes regulations for that valley that are not at the
same time made applicable elsewhere.

Having thus found that the main scheme of the act is not
invalid for want of generality, it results that such of its pro-
visions as incidentally regulate the internal affairs of existing
municipalities in order to carry out the main purpose are
likewise supportable, since the municipalities thus affected
are thrown into a class by themselves from the very ne-
cessity of the case. Thus, by section 5, all municipalities,
owning or controlling sewers within the limits of the sewerage
district which discharge into the streams or rivers therein,
are required to cause their sewers to be connected with, and
discharge into, the sewers to be constructed by the commis-
sioners at places to be designated by them, and all sewers here-
after constructed that might otherwise discharge into the
streams or rivers are required to be so constructed that the
discharge therefrom shall be delivered into the sewers to be
provided by the commissioners, and it is made the duty of the
commissioners to so construct their sewers that connection
may be made therewith. This provision operates alike upon
the sewerage systems of all municipalities within the dis-
trict without discrimination. It is manifestly general. The
same may be said of the provisions of section 7, respecting
the construction of sewers by the commissioners in streets,
highways, &c., and the proviso that when streets or high-
ways lie outside of the sewer district, the laying of sewers
under the streets shall be subject to the police regulations
of the governing bodies of the respective municipalities. So
with section 8, requiring consent of the municipal authorities

for the change of grade or location of streets. So with the provisions of section 19, authorizing contracts to be made with municipalities lying without the sewerage district. So with the provisions of section 20, giving to the sewerage commissioners exclusive powers within the sewerage district to protect the rivers and streams from pollution and prevent the deposit or discharge into the river of any sewage or other matter which may pollute the same, and to prohibit the emptying into such streams, by any municipality or part of a municipality lying within the district, of any sewage or other polluting matter, with power to apply to the Court of Chancery for injunction. The power thus conferred by section 20 is analogous to that which was under review in *State Board of Health* v. *Diamond Mills Paper Co.,* 18 *Dick. Ch. Rep.* 111; affirmed on appeal, 19 *Id.* 793.

The foregoing are the only provisions of the act that regulate the internal affairs of municipalities, except such as have to do with the distribution and enforcement of the financial burdens incident to the construction, maintenance and operation of the works that are established by the act. With respect to these burdens the scheme is that the cost of construction shall be defrayed from the proceeds of bonds, and the interest and sinking fund charges are to be apportioned among the respective municipalities and taxing districts lying in whole or in part within the sewerage district, in such proportion as the ratables within so much of the municipality or taxing district as is embraced within the sewerage district bear to the total ratables of the entire sewerage district. The annual cost of operation, maintenance and repair is to be apportioned among the several municipalities and taxing districts that lie in whole or in part within the sewerage district, according to the amount of sewage by them, respectively, delivered or discharged into the sewers constructed by the commissioners. The taxing boards and taxing officers of the respective municipalities are required to assess and collect the annual taxes necessary for these purposes at the same time and in the same manner as state and county taxes are required to be levied, assessed and collected. Whether these

provisions should be treated as imposing these financial burdens upon the municipalities as such, or whether, on the other hand, they do not, on a fair interpretation, impose the burdens directly upon the inhabitants and property within the several municipalities, using the local taxing officers simply as the agencies of the state for the assessment and collection of the district taxes, is perhaps open to question. The act that was under review in Freeholders of Passaic *v.* Stevenson, and that was adjudged by the Court of Errors and Appeals to amount to a regulation of the internal affairs of counties, required the salaries of the several prosecutors of the pleas to be paid by the collectors of the several counties, and of course required them to be paid from the county funds. This was held a regulation of the "internal affairs." *Freeholders of Passaic* v. *Stevenson,* 17 *Vroom* 173, 174, 187. Treating the fiscal provisions of the present act as imposing a burden upon the several municipalities affected (and not merely upon taxpayers and property holders therein), and thus as amounting to a regulation of the internal affairs of the municipalities, it is, we think, plain that these regulations are general and not special. The same rule is applied to all municipalities similarly situated.

The above reasoning shows, as we think, that the act does no violence to the constitutional prohibition of special legislation "regulating the internal affairs of towns and counties." For the same reasons, it does not infringe upon the clauses prohibiting special laws for "laying out, opening, altering and working roads or highways; vacating any road, town plot, street, alley or public grounds." The regulations relating to streets, roads, &c., operate uniformly throughout the district, without discrimination in favor of any locality therein. They are necessarily incident to the carrying out of the main purpose of the act, a circumstance that furnishes a rational basis for setting the included localities in a class by themselves, and renders the classification germane to the purposes of the legislation.

Next, the method adopted for the distribution and apportionment of the burden of taxation imposed by this act is

attacked as arbitrary, inequitable and unjust; as based upon no consideration of the special benefits accruing to individuals or localities; as imposing the cost upon a locality or group of localities arbitrarily selected by the legislature; as depriving the city of Paterson and the taxpayers therein, and other taxpayers of the sewerage district, of their property without compensation and without due process of law; and as establishing a taxing district not coincident with any political district.

It is needless to say that the bonding provisions contained in section 11, and the provision contained in section 12 for the borrowing of moneys in anticipation of the issuing of bonds, are but contrivances intended to distribute the cost of constructing the work in question throughout a period of years instead of having it met by taxation in a single year. The declaration contained in section 13 that the indebtedness incurred by the commissioners pursuant to the provisions of the act "shall be a charge upon all persons and property in the municipal or taxing districts lying in whole or in part within the sewerage district as fully as the legislature shall have power to authorize the same," is the equivalent simply of declaring that the public credit is to be pledged by the commissioners in the manner pointed out in the act. As the statute at the same time prescribes the mode in which the indebtedness is to be paid off—that is to say, by taxation extending throughout a period of years—this section imposes no charge upon persons and property beyond a liability to pay the prescribed taxes when and as the same shall be assessed. The validity of the act in this respect, therefore, depends upon the constitutionality of those provisions that relate to the distribution and apportionment of the burdens of taxation.

There is, of course, a plain distinction between ordinary taxation, whose exactions are imposed generally upon the persons and property owners within a designated taxing district, and assessments that are imposed upon specific parcels of real estate for special benefits accruing thereto by reason of local improvements. The basis of ordinary taxation is the

presumed public benefit, general throughout the district and participated in by all who reside or own property therein. The basis for special assessments is the exceptional enhancement in value of the property particularly benefited by reason of the local improvement.

In the statute now under review there is no attempt to levy a special assessment upon any real estate or other property as being peculiarly benefited. The scheme of the act is to distribute the entire cost of construction and maintenance of the work by way of general taxation. It is not suggested in the arguments of the learned counsel for the prosecutors that a general taxpayer has any constitutional right to require a portion of the general expenditure to be reimbursed by the imposition of special assessments upon particular pieces of property within the district. Nor is there, so far as we are aware, any reason or authority to support such a view. At the very least, the burden would be upon the prosecutors to show that some class of property is to be so peculiarly benefited that it ought to be specially assessed. This burden has not been sustained. Indeed, in the circumstances of the present case it is difficult to see how any particular properties, or group of properties, could be selected as justly subject to a special imposition on the ground of peculiar benefits to be derived from the improvement. If the project were intended to relieve certain lands from natural disadvantages, the case might in this respect be different. But the lands that in reasonable anticipation are to be specially advantaged by the cleansing of the Passaic river are those that happen to have been heretofore especially disadvantaged by the pollution of the river; they are simply to be relieved from the consequences of that pollution. Since the pollution is presumably unlawful as against private landowners, and has in a sense worked a private nuisance to such lands, it could not be deemed just to impose upon the lands themselves the cost of relief from the nuisance. On the other hand, if an attempt had been made to impose assessments for benefits upon the landed properties throughout the sewerage district that make connections with the municipal sewers which

have produced the river pollution, it would doubtless have been met with the objection that those properties, as such, are worth no more with a sewer whose outlet is in New York bay than with a sewer whose outlet is in the Passaic river.

The legislature has dealt with the existing conditions as detrimental not so much to property as to the health of the population residing within the sewerage district, and has, not inequitably, determined that the benefits of the improvement will be so generally distributed that the cost may well be met by general taxation.

The complaint here made by the prosecutors is, first, that the benefits of the public work established by the act will accrue to the people of the state at large, so that its burdens ought to be borne from the state treasury. This view, we think, is entirely untenable. The matter rests largely in legislative discretion. *Hagar* v. *Reclamation District,* 111 *U. S.* 701, 705. The purpose of the act, as declared in its preamble, is to safeguard the health of the people residing within the sewerage district. It is therefore manifestly just and equitable that the cost of establishing and maintaining the works provided for by the act should be imposed upon a limited district and not upon the state at large. If, for instance, any part of the financial burden of this local improvement had been attempted to be imposed upon the counties other than Bergen, Passaic, Essex and Hudson, the act would have savored decidedly of confiscation under the guise of taxation.

The next and principal argument is that the mode adopted by the legislature in selecting the persons and property to be taxed, and the method of distribution and apportionment that is adopted, are violative of principles that have been declared in our judicial decisions to be essential to a constitutional scheme of general taxation.

The distribution and apportionment of general taxation imposed for public purposes is one of the most vital functions of the legislative department of government, being essential to the exercise of the power of taxation itself. As was said by Chief Justice Beasley, in the Agens case (8 *Vroom,* at p.

420): "There is nothing in the constitution of this state that requires that all the property in the state, or any particular subdivision of the state, must be embraced in the operation of every law levying a tax. That the effect of such laws may not extend beyond certain prescribed limits is perfectly indisputable. It is upon this principle that taxes raised in counties, townships and cities are vindicated." And, in the language of Justice Field, in *Hagar* v. *Reclamation District,* 111 *U. S.* (at *p.* 705): "The rule of equality and uniformity, prescribed in cases of taxation for state and county purposes, does not require that all property, or all persons in a county or district, shall be taxed for local purposes. Such an application of the rule would often produce the very inequality it was designed to prevent." Now, it seems to us clear that the power of selecting a district for the imposition of general taxation for public purposes that are non-municipal or extra-municipal, is quite analogous to the power of selecting a given municipal division as the taxing district for the imposition of taxes that pertain to the purposes of such municipality. The general doctrine is laid down in *Cooley Tax.* (*2d ed.*) 140, 165; *Id.* (*3d ed.*) 225, 254; *Desty Tax.,* § 58; *25 Am. & Eng. Encycl. L.* (*1st ed.*), *tit. "Taxation,"* 183, &c.

But it is agued that our decisions have established the rule that a taxing district must be coincident with some political district. This is not an accurate statement of what has been decided. A close scrutiny of the adjudged cases will show that they have not gone beyond this extent; that with respect to the exercise of the delegated power of levying taxes (using this term "levying taxes" as referring to the legislative function of taxation), a taxing district may not be created that is narrower in extent than a single political district. The cases relied upon are *Tidewater Company* v. *Coster,* 3 *C. E. Gr.* 518; *State, Agens, pros.,* v. *Newark,* 8 *Vroom* 415; *State, Baldwin, pros.,* v. *Fuller,* 10 *Id.* 576; *S. C. affirmed,* 11 *Id.* 615; *State, Lydecker, pros.,* v. *Englewood,* 12 *Id.* 154; *Morgan* v. *Comptroller of Elizabeth,* 15 *Id.* 571; *Kean* v. *Driggs*

*Drainage Co.,* 16 *Id.* 91; *Auryansen* v. *Hackensack Improvement Co., Id.* 113; *Taylor* v. *Smith,* 21 *Id.* 101.

With the rule established in the Tidewater case and re-affirmed in the Agens case, that assessments imposed upon specific parcels of property for the special and extraordinary benefits conferred thereon by local improvements must be limited to the amount of the peculiar benefits, we are not now concerned. In the Agens case (which related to special assessments and not to general taxation), Chief Justice Beasley, speaking for the Court of Errors and Appeals, in arguing against the notion that the legislative power *to* select the subjects of taxation is untrammeled, employed this antithesis: "It would seem much more in accordance with correct theory to maintain that the power of selection of the property to be taxed cannot be contracted to narrower bounds than the political district within which it is to operate, than that such power is entirely illimitable." Following this intimation, this court, in Baldwin *v.* Fuller, held that the legislature has no power to impose a particular tax upon *any territory narrower in bounds than the political district of which it is a part,* without having regard to the special benefits which may accrue to those upon whom it is made to fall. This rule was followed in the Lydecker, Morgan and Auryansen cases. It will be observed, however, that in all these cases the court was dealing with instances of the delegated legislative power of taxation, and with taxes that were laid by municipal officers for municipal purposes—that is, for purposes that pertained not merely to the territory, but to the governmental objects of a given political district that included the lesser taxing district within its bounds. The mischief to be guarded against was the abuse of authority by officials chosen to represent an entire political district, who imposed taxes upon a limited portion of the community. That this is the *rationale* of the rule appears from what was said by Mr. Justice Magie (now Chancellor), in *Taylor* v. *Smith,* 21 *Vroom* 101 (at *p.* 106), where he cited the above cases as establishing that the legislature has no authority to *delegate the power of general taxation* except to political

divisions or corporations of the state, and that for the sole purpose of enabling them to exercise the powers of government conferred upon them within their locality. See, to the same effect, *Peck* v. *Township of Raritan,* 23 *Id.* (at *p.* 320) ; *Howell* v. *Millville,* 31 *Id.* (at *p.* 97), and *Smith* v. *Howell, Id.* 384. Whether the power of taxation is unconstitutionally delegated by the present act is a separate question, to be dealt with presently.

But the concern of the courts with any method adopted by the legislature for the distribution and apportionment of taxation for public purposes is confined to upholding the constitutional guaranty against the taking of private property for public use without compensation. The doctrine of Baldwin *v.* Fuller is grounded upon that guaranty and is limited accordingly. Its object is to safeguard the few from confiscation of their property for the general benefit under the guise of taxation. In this view the rule that a taxing district, established for purposes such as were present in the above cases, may not be made smaller-in extent than a single political district, has a distinct utility. But the reason for the rule wholly disappears when the taxing district is established by the general legislature for public purposes whose general benefits extend beyond the lines of any political district, so that the taxing district (as here) includes the whole of certain political districts and parts of others; and when the taxes in question are imposed not by any delegated authority but by the legislature itself. And so, in our opinion, the limitation which the rule of Baldwin *v.* Fuller apparently imposes upon the general power of the legislature to establish districts for the purpose of localizing taxation and apportioning its burdens has no applicancy to the taxing district or districts established by the act now before us.

The method of apportionment, however, is further assailed as being not uniform throughout the whole of the taxing district itself. This criticism relates to the provision that municipal divisions, which are only in part included within the sewerage district, shall contribute to the construction fund in proportion to their ratables that are within the dis-

trict, while the share thus apportioned shall be raised by general tax upon persons and property throughout such municipal division. But it does not follow that this method of apportionment is arbitrary or inequitable in its results, much less that it is confiscatory. If the pollution of the river demonstrably appeared to be caused solely or chiefly by the inhabitants of the sewerage district as such, it might be equitable that the entire burden of taxation should be imposed upon the inhabitants of the district and property situated therein. But it is clear that a great portion, and probably the most dangerous portion, of the polluting material proceeds from municipal sewers, some of which are controlled by municipalities whose territory is not entirely included within the sewerage district. It is not unfair to assume that the public benefit of the several systems of municipal sewers is coincident with the bounds of the several municipalities, and for this reason it may not be inequitable for the legislature to apportion the taxation among the municipalities as such, or among persons and property throughout each of the several municipal divisions; the result being that the burden of taxation is extended rather wider than the bounds of the sewerage district which is injuriously affected by the river pollution. In view of this, we cannot say that it was unreasonable for the legislature, recognizing the difficulties that lay in the way of making a single taxing district coincident in bounds with the sewerage district, to include the entire territory of all municipal divisions that either in whole or in part are included within the sewerage district.

If we treat the area thus subjected to taxation as a single taxing district, we find that it includes the whole of the sewerage district and so much additional territory as is necessary in order to embrace the whole territory of the several municipal divisions that are in part included within the sewerage district. In this aspect the distribution of taxation throughout the district is not uniform, for a different rule will prevail in those municipal divisions which are only in part within the sewerage district from that which obtains

in those that are wholly included within the sewerage district. But the act may just as well be viewed as establishing so many taxing districts as there are municipalities affected by the sewerage plan. In this aspect there is an apportionment of the general burden of taxation among the several municipal divisions affected, that apportionment being based upon a definite rule prescribed by the legislature in the act. The difference is not substantial. In either case the question is whether the apportionment is justifiable; and in either case the municipality, or, rather, the municipal taxing officers, are used as convenient governmental agencies for reaching the taxpayers upon whom the burden is designed to rest.

The rule that general taxes shall be uniform throughout the taxing district is only a means to the end of equitable apportionment. It has for its basis the prevention of unfounded discriminations as between taxpayers. For the guidance of administrative officers it is, perhaps, the only practicable rule. But it cannot rationally be said to form a limitation upon the sovereign legislative power in which taxation originates. With respect to a legislative measure such as that before us, the courts are limited to inquiring whether the scheme of taxation palpably amounts to an evasion of the constitutional guaranty that property shall not be taken for public use without compensation. The present act apportions the burden among the several municipal divisions affected in the following manner: First, as to cost of construction, in proportion to the amount of the taxable ratables that are within the sewerage district; and secondly, with regard to the cost of maintenance and operation, it apportions the taxes according to the amount of sewage delivered by the respective municipalities into the sewerage system that is to be established by the commissioners. Each of these methods of apportionment rests upon a rational basis, and cannot be deemed as necessarily unjust or inequitable, nor is there anything in the case to show that they are so in truth. See *King* v. *Reed,* 14 *Vroom* 186 (at *p.* 200). Except in a clear case, the question of apportioning taxation

must be treated as resting solely within the legislative discretion. Only where the abuse of discretion is palpable are the courts justified in setting aside a scheme of taxation as amounting in effect to a taking of property without compensation.

But if we are wrong in this, it seems clear that it does not lie in the mouth of the present prosecutors to raise the objection. We must assume that the bounds of the sewerage district were chosen by the legislature in the exercise of a fair discretion. They were established by an act passed in 1902, and have been adopted by the legislature of 1903 for the purposes of this act. We must take it for granted that those boundaries were reasonably adopted. That being so, it would have been not clearly inequitable for the legislature to limit taxation to the bounds of the sewerage district, and to distribute it uniformly among all persons and property therein. Now the adoption of that method would have resulted precisely the same, so far as the burden of the scheme upon the city of Paterson and citizens and property owners therein is concerned, as the scheme of apportionment that the legislature have adopted; for in apportioning to municipal divisions that lie only in part within the sewerage district the share of the burden proportionate to that part, they have left the burden upon Paterson (all of which is within the district) at precisely the same measure that would have obtained had only persons and property within the sewerage district been taxed. Therefore if the scheme of apportionment is in this respect inequitable, the prosecutors are not aggrieved thereby.

The act provides that the taxes are to be assessed and collected in the same manner as state and county taxes. This does not amount to a deprivation of property without due process of law, within the prohibition of the fourteenth amendment of the federal constitution. 10 *Am. & Eng. Encycl. L.* (*2d ed.*) 308.

It is further objected that by this act the taxing power is delegated to the "Passaic Valley Sewerage Commissioners," a corporation other than a political division, and that such delegation is prohibited by the constitution. This objection

fails to take into account the essential difference between the *legislative* function of *levying* taxes—that is, the imposition of taxes upon persons and property—and the *administrative function* of *assessing and collecting* the taxes thus levied. The former includes the adoption of a law, ordinance or resolution declaring that for certain purposes taxes shall be laid, and according to what rule, including a designation of the persons and property to be subjected thereto, and the district within which the same shall be operative. The latter function includes the details of assessment, collection, adjustment, enforcement and the like, which in the nature of things are of necessity entrusted to subordinate functionaries of the government.

In the article on "Taxation," in 27 *Am. & Eng. Encycl. L.* (*2d ed.*), the distinction between the legislative and administrative functions is clearly recognized, at pages 658, 729, 730, 733 and 734. The confusion that sometimes arises in the discussion of this question is attributable to the ambiguous meaning of the verb "levy," as applied to taxation. The indiscriminate use of this word is pointed out in 27 *Am. & Eng. Encycl. L.* (*2d ed.*), at *p.* 729. In section 16 of the act under review the commissioners are required each year to "order and cause a tax to be levied and assessed," &c.; and they are to "certify to the tax assessor, taxing board or taxing officer the amount of tax required to be levied, assessed and raised; * * * and the said assessors * * * shall assess said sums so directed to be assessed [and certified to them] upon all the persons and property liable to be assessed for state or county taxes; and the said tax shall be levied, assessed and collected by the same officers, * * * and the tax so levied upon real estate shall be a lien thereon," &c. It is plain that the word "levied" is here used either as synonymous with "assessed" (a mere iteration) or else in the sense of enforcing and collecting the taxes. In the beginning of the section it seems to be used in the former meaning; in the latter part of the section its use seems to indicate that the process of collection is referred to. But it is plain that throughout the section the word "levy" is used

as referring to the administrative functions of taxation, and not at all to the legislative function.

The distinction between these functions was pointed out by Justice Depue in *Township of Bernards* v. *Allen,* 32 *Vroom* 228 (at *p.* 238), and is also referred to in the dissenting opinion of Chief Justice Magie, on *p.* 692. It is worthy of note that Justice Depue used the phrase "levying taxes" as descriptive of the legislative function, while Chief Justice Magie used it as referring to the administrative process of collecting the taxes. The substantial distinction to be kept in mind is that which exists between the legislative and administrative functions; the term used in describing either function is immaterial. In the opinon of Mr. Justice Depue in the case just cited (32 *Vroom,* at *p.* 238) it was expressly stated that the legislature, having prescribed a rule of taxation, may entrust the assessment and collection thereof to other officers. The law under review in that case was declared unconstitutional, because it confided the entire legislative function of municipal taxation to a commission not elected by the people. Whether the doctrine of that case would be applied to a taxing district such as the one now under consideration, established for purposes not municipal in their character, may well be doubted. That question need not now be considered, for the act before us makes no delegation of the *legislative* function of taxation. The powers of the sewerage commissioners with respect to taxation are not legislative but administrative. The act of the legislature has granted the tax, declared the purpose, delimited the taxing district, prescribed the rules of distribution and apportionment, and limited the aggregate of the burden. Besides that limitation, the expenditures authorized by the act are as closely guarded as is practicable in a legislative measure. The authorization is of a single public work, the purpose and general plan of which are defined; any work exceeding in cost $5,000 is to be let to the lowest bidder after public advertisement; no contract beyond $25,000 is to be awarded until approved by the governor. The authority given to the commissioners to purchase lands is, of course, subject to

the implied condition that they may be purchased at a reasonable price; if no such price can be fixed by agreement there is power to resort to condemnation proceedings, which, presumably, will result in giving to the landowner the fair value of the property taken, and no more. To the extent that the execution of this public work, under these safeguards, will require the expenditure of public moneys not exceeding in the aggregate $9,000,000, the legislature has in this act made appropriation of the people's money and has granted the tax to raise the same. It has designated the commissioners as administrative officers to supervise the details of assessment and collection, and has placed under them the local assessors and collectors. Unless the legislature is to remain in continuous session and carry out, through its own committees, the details of taxation, it is difficult to see how any greater particularity of legislation is to be achieved than in the act before us.

It is further objected that the city of Paterson has a vested right to empty its sewers into the Passaic river, which is interfered with by this legislation, it being claimed that this method of sewage disposal cannot be abolished without compensation to the city. The acts under which these sewers were constructed are *Pamph. L.* 1867, *p.* 653, § 17; *Pamph. L.* 1868, *p.* 126; *Pamph. L.* 1871, *pp.* 846, 855. In *Simmons* v. *Paterson,* 15 *Dick. Ch. Rep.* 385, it was held by the Court of Errors and Appeals that these acts constituted a legislative authority for discharging the contents of the sewers into the river. Therefore the city was not chargeable as for maintaining a public nuisance. With respect to the rights of a private riparian owner above tidewater it was held that since the city had incurred the large expense of installing its sewer system, in reliance upon legislative authority, with long acquiescence upon the part of the landowner, he would not be allowed an injunction to restrain the use of the sewers, *provided the city would make compensation to him* for the deprivation of his property right. But it was not held in that case, and we fail to see how it can be held, that the legislative authority referred to is irrevocable by the legis-

lature. The acts that conferred the authority have not any semblance of contractual form or quality. And if they had, they would be none the less repealable so soon, at least, as such repeal is demanded in the interests of the public health and safety. In *Stone* v. *Mississippi*, 101 *U. S.* 814, 819, Chief Justice Waite said: "No legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants." In *Butchers' Union Co.* v. *Crescent City Co.*, 111 *Id.* 746, 751, Mr. Justice Miller said: "A wise public policy forbids the legislative body to divest itself of the power to enact laws for the preservation of health and the repression of crime." See, also, *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 *Id.* 650, 672; *Mugler* v. *Kansas*, 123 *Id.* 623, 664.

In our judgment, the acts under which Paterson was authorized to empty its sewage into the Passaic river amount merely to a legislative license, revocable at the will of the legislature; certainly, whenever the public health and safety require. The act before us, in withdrawing that license— prohibiting further pollution of the river, and requiring that the sewage of the city shall hereafter be discharged into the sewers to be constructed under this act—is only a reasonable exercise of the police power of the state, subject to which power public and private rights and property alike are held.

It is perhaps unnecessary to discuss the question whether Paterson's rights in the sewers have such attributes of private property as would render them inviolable by the legislature. See *Dill. Mun. Corp.* (4th ed.), §§ 66, 71; 20 *Am. & Eng. Encycl. L.* (2d ed.), tit. "Municipal Corporations," 1220. Even treating them as private property, they are subject to police regulations, such as this act imposes, to the end that their use may not unduly endanger the public health. *State* v. *Wheeler*, 15 *Vroom* 88, 91.

We are not willing, however, to assent to the notion that the municipal sewers, and the privilege of discharging them into the river, are held by the city as private property in such sense that the legislature cannot impair the city's rights therein without compensation. The municipal corporation is

simply one of the governmental agencies of the state, and is subject to legislative control without limitation, saving such as the constitution imposes. The only limitation that is cited as pertinent to the present case is the prohibition of special laws, which, as we have already seen, is not violated. The constitutional provision that private property shall not be taken for public use without compensation has no applicancy. The sewers are already public property, the municipal corporation being but a public trustee, with powers conferred by the legislature for the purposes of the trust. Those powers may be revoked, and the trust resumed by the state, at the will of the legislature. *Meriwether* v. *Garrett,* 102 *U. S.* 472, 513; *Essex Public Road Board* v. *Skinkle,* 20 *Vroom* 641, 671; *Millburn* v. *South Orange,* 26 *Id.* 254, 257; *Newark* v. *Watson,* 27 *Id.* 667, 673.

It is next objected that the legislature has no authority to compel the city of Paterson to incur, without its consent, the cost of the trunk sewer and the maintenance of the disposal works, as provided in the act under consideration.

This objection proceeds on the assumption that the act imposes the cost upon the municipality as such, rather than upon its citizens and property owners, an assumption whose soundness we cannot concede. For the purposes of the present objection, however, the distinction seems to point to no substantial difference, since the power to impose the cost upon the citizens and property owners would necessarily include the power to employ the municipal corporation as a convenient governmental agency for enforcing payment of the cost through the instrumentality of local taxation.

The objection itself, when analyzed, will be seen to rest upon the notion that in establishing a municipal corporation the legislature has conferred upon it some exclusive powers beyond revocation or repealer. This notion is contrary to the fundamental principle that municipal corporations are simply governmental agencies adopted for reasons of convenience in order to deal with local affairs. The contrary doctrine—that which treats a municipal corporation as en-

dowed with some measure of independent sovereignty—has found expression in one notable decision—*People, ex rel. Board of Park Commissioners,* v. *Common Council of Detroit* (known as the Detroit park case), 28 *Mich.* 228; *S. C.,* 15 *Am. Rep.* 202. There it was held that the legislature could not compel the city to establish and maintain by local taxation a park and boulevard within the city. The reasoning by which this result was reached is limited to matters of purely local concern, and Judge Cooley, by whom the opinion was delivered, expressly declared that "the local authorities cannot be permitted to determine for themselves whether they will contribute through taxation to the support of the state government, or assist when called upon to suppress insurrections, *or aid in the enforcement of the police laws;* upon all such subjects the state may exercise compulsory authority, and may enforce the performance of local duties either by employing local officers for the purpose or through agents or officers of its own appointment." And in the later case of *Davock* v. *Moore,* 105 *Mich.* 120; 63 *N. W. Rep.* 424, the same court expressly affirms the compulsory power of the general legislature over the municipalities in respect to taxes imposed for the preservation of the public health. Judge Cooley, in his work on *"Taxation"* (published after the decision in the Detroit case), clearly recognizes that in some matters, ordinarily confided by the general legislature to local control, the interest of the state is still so paramount that the legislature may compel taxation without the consent of those locally concerned. Among these he instances the preservation of the public peace and health, the care of roads and bridges, schools, &c. *Cooley Tax.* (2*d* ed.) 684; *Id.* (3*d* ed.) 1300. Judge Dillon likewise, in his work on *"Municipal Corporations,"* recognizes that the doctrine of the Detroit case is not applicable to legislation establishing a system of sewers or drainage for the protection of the health of the people, and that for such purposes the legislature may compel a city to make provision for a proper system and raise the necessary taxes or make the necessary assessments to that end. 1 *Dill. Mun. Corp.* (4*th* ed.), § 73.

In *Gordon* v. *Cornes,* 47 *N. Y.* 608, it was held that a tax may be imposed by the legislature upon a particular locality (in this case a particular town) to aid in a public purpose which the legislature may reasonably regard as a benefit to that locality as well as to the state at large; and that inequality in the apportionment of the expense of the undertaking, as between the state and the locality, cannot be alleged to impugn the validity of the act in any but an extreme case of arbitrary apportionment. See, also, *Darlington* v. *Mayor, &c., of New York,* 31 *Id.* 164 (at *p.* 189) ; *People* v. *Flagg,* 46 *Id.* 401. On the other hand, in *People* v. *Bacheller,* 53 *Id.* 128; 13 *Am. Rep.* 480, it was held that while the legislature may compel a municipal corporation to tax its citizens in order to provide for the establishment and maintenance of public improvement (such as the ordinary highways that were in question in *People* v. *Flagg,* 46 *Id.* 401), yet a municipal corporation cannot be thus compelled, without its consent or that of its taxable inhabitants, to tax itself in order to aid a private enterprise, such as a railroad operated for the gain of its stockholders.

The power of the state to require local improvements to be made which are essential to the health and prosperity of any community within its borders is recognized, also, in *Hagar* v. *Reclamation District,* 111 *U. S.* 701, 704; *Jensen* v. *Polk County,* 47 *Wis.* 298; *Bryant* v. *Robbins,* 70 *Id.* 258; *City of Philadelphia* v. *Field,* 58 *Pa. St.* 320; *Philadelphia* v. *Fox,* 64 *Id.* 169.

The practical result of adopting a contrary view is conspicuously illustrated in the case before us. If the sovereign state, acting through the general legislature, is without power to require the citizens and property owners of Paterson to contribute taxes towards the execution of any public work that may be necessary to prevent the off-scourings of the city from carrying disease, or even death, to its own inhabitants and the inhabitants of adjoining municipalities, then, by the same reasoning, the legislature is impotent to compel the people of Dover, Boonton, Morristown and other towns in the watershed of the Passaic above Paterson to pay taxes

towards keeping the water of the river free from pollution detrimental to Paterson. The doctrine of the "consent of the governed" has, legitimately, no such scope. Taxes, although granted by the people's representatives, always operate *in invitum* as against the taxpayer. The present objection is, we think, entirely unsubstantial.

Next, the prosecutors invoke article 4, section 6, paragraph 4, of the constitution, declaring that the legislature shall not, in any manner, create any debt or liability of the state exceeding $100,000, without the previous approval of the people at a general election. But this prohibition has no applicancy to local or municipal indebtednesses. *People* v. *Flagg,* 46 *N. Y.* 401, 406; *Cass* v. *Dillon,* 2 *Ohio St.* 607, 613; *Clark* v. *City of Janesville,* 10 *Wis.* 136; *Bushnell* v. *Beloit, Id.* 195, 221; *Pattison* v. *Board of Supervisors,* 13 *Cal.* 175, 182; *Cooley Const. Lim.* (*7th ed.*) 321, 325. A contrary view would overthrow practically all our municipal bond issues, for they depend ultimately on legislative authorization.

The final objection urged against this act is that it impairs the obligation of contracts in requiring that the taxes levied upon real estate, pursuant to its provision, shall be and remain a first and paramount lien thereon until paid, it being insisted that this materially interferes with the rights of the present bondholders of the city of Paterson. We are referred to the statutes found in *Pamph. L.* 1901, *p.* 13, and *Pamph. L.* 1902, *p.* 13, for the legislative authority pursuant to which the outstanding bonds have been issued. The former act provides that the annual interest shall be raised by special tax, and that, in order to redeem the bonds at maturity, a sinking fund shall be established, to be created by a special annual tax or from the proceeds of assessments for improvements. The act of 1902 contains somewhat similar provisions. Neither of these acts gives in express terms any lien upon the taxable real estate by way of security for their payment. So far as appears, there is nothing in the act establishing the sewerage commission that defeats any of the terms of existing contracts between the city of Paterson and its creditors, or that impairs in any way the obligation of

those bonds.    Moreover, the terms of the present act would not be construed as interfering with vested rights.    If the provision for a first and paramount lien upon taxable real estate could be construed as such interference, and as being for that reason unconstitutional, it may be exscinded from the act without affecting the general scheme.    Full authority for eliminating it is found in section 23, which declares that in case, for any reason, any section or any provision of this act shall be questioned in any court, and shall be held to be unconstitutional or invalid, the same shall not be held to affect any other section or provision of the act.

Section 23 also renders it unnecessary to discuss the constitutionality of the proviso contained in section 4, requiring that contracts for work required to be done under the act shall contain a stipulation that, so far as practicable, the work shall be performed by union labor, and preference be given to citizens of the State of New Jersey.    This proviso, if unconstitutional, is clearly separable.

The writ of *certiorari* should be dismissed, with costs.

GARRETSON, J., concurs in the above views.

FORT, J. (dissenting).    This writ brings up for review a resolution of the Passaic Valley Sewerage Commissioners, passed June 8th, 1903, authorizing the issuance and sale of corporate bonds to the amount of $1,000,000 to prosecute the works committed to their control by the statute under which they are created.

By an act entitled "An act to create a sewerage district to be called Passaic valley sewerage district," approved March 27th, 1902, the legislature set apart, by metes and bounds, a certain part of the territory of the state and created the Passaic Valley Sewerage District.    By this act it is declared that the district thus created "shall be and is hereby constituted a sewerage district under the name and title of the Passaic Valley Sewerage District, and it shall be entitled to all of the authority, and shall be subject to all the laws of

this state concerning sewerage districts so created." *Pamph. L.* 1902, *p.* 190.

On the same day there was approved an act entitled "An act authorizing the appointment and defining the powers and duties of commissioners in sewage and drainage districts created for the purpose of relieving the streams and rivers therein from pollution, and to provide a plan for the prevention thereof, and providing for the raising, expenditure and payment of moneys necessary for this purpose." *Pamph. L.* 1902, *p.* 195.

It is within the power of the legislature, under our state constitution, to erect, by a special act, certain territory into a municipality. In Pell *v.* Newark, this court said: "The right is still preserved to the legislature to create cities, towns and counties, and to change their boundaries, by special laws so as to make them appropriate political districts for the application of general laws establishing uniform rules for their regulation." *Pell v. Newark,* 11 *Vroom* 71.

Whether, in creating the municipal district, it is essential that notice of intention to do so shall be advertised, as required by paragraph 9 of section 7 of article 4 of the state constitution, it will not be necessary to determine, because it does not appear in the record that such a notice was not given. It is provided by statute that the publication of any law in the pamphlet laws published by the state shall be *prima facie* evidence that the notice required by the constitution has been complied with. *Pamph. L.* 1876, *p.* 11, § 5.

This act appears in the pamphlet laws of 1902, and I shall presume that due notice was given, if required. *State Board of Health* v. *Diamond Mills Paper Co.,* 18 *Dick. Ch. Rep.* 111; *S. C.,* 19 *Id.* 793; *Freeholders* v. *Stevenson,* 17 *Vroom* 173, 186.

The act of March 27th, 1902 (*Pamph. L., p.* 190, *ch.* 48), will therefore be considered as having erected a subdivision of the state for certain purposes—municipal in character—and to be a valid exercise of legislative authority for this purpose.

While it may not be necessary to pass upon the validity of

chapter 49 of the laws of 1902 (*Pamph. L., p.* 195), author-
izing the appointment and defining the duties of commis-
sioners in sewage and drainage districts, it may be useful to
call attention to the fact that the latter act does, in general
terms, create authority for the appointment of commissioners
for *any* ' sewerage district created by the legislature, and
defines the powers of such commissioners when appointed.
This act does not authorize the appointment of commissioners
for the Passaic Valley Sewerage District, created by the act
of March 27th, 1902, or of any other sewerage district, but
provides for such officials in all sewerage districts created or
to be created by the legislature. .

The first section of the act declares that "upon the creation
and incorporation by the legislature of any sewerage and
drainage district for the purposes mentioned in the title of
the act, it shall be the duty of the governor forthwith to ap-
point, &c., five residents within the district, who shall consti-
tute a board of commissioners," &c.

The only clause in the act of March 27th, 1902, about which
doubt might be suggested is paragraph 2, section 7; that,
however, is independent and severable if questionable.

Chapter 49 of the laws of 1902 seems also to be within the
reasoning of the decision in the *State Board of Health* v.
*Diamond Mills Paper Co.,* 18 *Dick. Ch. Rep.* 111, which
case was affirmed by the Court of Errors in 19 *Id.* 793.

This act is in effect an act to provide a method to prevent
the pollution of the waters and streams of the state, and
can, by legislative will, be made applicable to every river and
stream in the state lying within a sewerage and drainage
district which has been, or may hereafter be, created by the
legislature. Such an act is general and not local or special.

This brings me to the consideration of chapter 1 of the
special session of the legislature of 1903 entitled "An act
to relieve from pollution the rivers and streams within the
Passaic valley sewerage district, established and defined by
an act of the legislature entitled 'An act to create a sewerage
district to be called the Passaic valley sewerage district,'
approved March twenty-seventh, one thousand nine hundred

and two, and for this purpose establishing therefor a district board of commissioners, defining its powers and duties, and providing for the appointment, terms of office, duties and compensation of such commissioners, and further providing for the raising, collecting and expenditure of the necessary moneys," approved April 22d, 1903. *Pamph. L., p.* 777.

Does not the mere reading of the title of this act determine its character? It does not purport to be other than an act applicable to a single sewerage district. Its purpose is declared by its title to be "An act to relieve from pollution the rivers and streams *within the Passaic valley sewerage district,"* and, as if with the purpose to further circumscribe and limit its application to a special and local subdivision of the state, it declares that the district to which it shall apply shall be that "established and defined by an act of the legislature entitled 'An act to create a sewerage district to be called the Passaic valley sewerage district, approved March twenty-seventh, one thousand nine hundred and two.'"

We have seen that the legislature may erect a city, a town, a borough, or a sewerage district, by a special act, and define in the act its boundaries. But immediately upon its creating such a city, town, borough or sewerage district, the municipality thus created is governed by the laws applicable to the cities, towns, boroughs or sewerage districts of its class. A law applicable to one of the class alone, *eo nomine,* cannot be enacted. Such an act would be special.

Suppose the legislature erects certain territory into a borough and declares that that territory shall constitute the borough of "Harmony," can it then proceed to enact a law to "relieve from pollution the rivers and streams within the borough of Harmony, established by an act of the legislature entitled 'An act to create the borough of Harmony?'"

It might possibly enact a law to relieve from pollution the rivers and streams within the boroughs of this state, and define how boroughs might do so, but upon what principle can it be said that a law is general when applicable to a single borough, because it refers to the title of the act which creates it?

A sewerage district of the character here under consideration is undoubtedly *quasi*-municipal. It has corporate powers, *sub modo,* and for certain specified purposes, all of which are public.

As was said by Judge Parker, in Skinkle *v.* Essex Public Road Board, "it may properly be·termed a *quasi* corporation, whose functions are wholly of a public nature, and having corporate powers only for certain specified purposes. Such a corporation is a mere agent, employed as a part of the machinery of government to aid in carrying on a portion of the affairs of a local nature." *Skinkle* v. *Essex Public Road Board,* 20 *Vroom* (at *p.* 670) ; *Ang. & A. Corp. (9th ed.),* § 23; *Commissioner of Roads* v. *McPherson, 1 Spears* 218; *Jansel* v. *Ostrander, 1 Cow.* 670 ; *North Hempstead* v. *Hempstead,* 2 *Wend.* 109 ; *Skinkle* v. *Essex Public Road Board,* 140 *U. S..* (at *p.* 339).

Legislation affecting a municipal district such as the Passaic Valley Sewerage District, and creating a board of commissioners therein, with certain specified powers, to be exercised for public purposes, is legislation applicable to a municipality, and to be valid must be such as will stand the constitutional test against local and special laws "regulating the internal affairs of towns and counties."

I am unable to see any escape from the conclusion that the title of the act approved April 22d, 1903, is clearly special, and that under it all of the provisions of the act are confined to the internal regulation of a local and special municipal purpose, namely, the relief from pollution of the rivers and streams within the single municipal division of the state known as the "Passaic Valley Sewerage District."

The act before us cannot be distinguished in principle from an act which might be entitled "An act to relieve from pollution the rivers and streams within the city of Newark," and surely such a statute would, under our constitution, being ·applicable to Newark only, be an act regulating internal affairs, and clearly special and unconstitutional.

It was contended on the argument that admitting that this act was limited in its application to the single municipality

known as the Passaic Valley Sewerage District, still it was valid, because there is in the state only one such corporate entity, and therefore the rule applied by this court in *Budd* v. *Hancock,* 37 *Vroom* 133, was applicable.

It is true that the question of whether a law is local or special depends upon what it excludes, and not so much upon what it includes. But applying that rule to this act, it will be seen that it excludes every possible municipal district of the state, save one. But, while it is conceded that that is true, it is answered that the municipal district *included* is the *only one* of its class in the state. But that is not the test. Such an act, to be general, must include all other possible municipalities of the same class, existent or to become existent, which may be similarly situated. The exclusion of any such makes the act special. If there were but one city in the state, would any one presume to contend that an act made applicable to it, by its corporate name, would not be special? Wherein is the distinction between such an act and the one under review?

Nor is the body of the act, in many unseverable respects, less objectionable than its title, under article 4, section 7, paragraph 11 of our state constitution, which declares that "the legislature shall not pass private, local or special laws regulating the internal affairs of towns and counties."

As a preliminary statement upon this part of the case, it should be said that the whole body of the act, following its title, is made applicable solely to the Passaic Valley Sewerage District. It only relates to it, and to the commissioners appointed to manage and govern it, save in the one respect where it refers to and individualizes for the purposes of taxation, under the act, the several local municipalities embraced within the boundaries of the sewerage district as defined in the act of March 27th, 1902.

It has no other object or purpose than to provide for the regulation and control of the internal affairs of this particular sewerage district and the several municipal or taxing districts, which are local municipalities, lying in whole or in part within it.

If legislation, which refers to such a district so created by name, is not general, it is impossible to see how this act can be held not to be special.

All discussion as to the right and power of the state to set up, under its police power, a district and govern it, and provide for the prevention of the pollution of the rivers and streams within such district, so ably presented by counsel on the argument, is beside the question.

In exercising the police power the legislature is controlled by constitutional restrictions. This power is not higher than the constitution. While the legislature may prohibit the pollution of the rivers and streams, and create municipal subdivisions with certain powers and functions to this end, yet, in creating them it is bound by the mandate of the constitution that it shall not regulate the internal affairs of any municipal subdivision so created by special laws.

In matters of police regulation the legislature is undoubtedly supreme, but its powers are subject to all constitutional limitations upon its otherwise unlimited supremacy. 22 *Am. & Eng. Encycl. L.* (*2d. ed.*) 937; *Tiede. Lim. Pol. Pow.,* § 4.

I have not thought it necessary, therefore, in this case, to discuss the general question of the police power of the legislature as to the prevention of the pollution of the rivers and streams of the state.

In considering the case, we must keep constantly in mind the fact that the act of April 22d, 1903, relates exclusively to the Passaic Valley Sewerage District as erected by the act of March 27th, 1902, with incidental reference to the several local municipalities or parts of municipalities lying within its boundaries.

By the act power is given to the board of sewerage commissioners to bond the taxing district, borrow money in anticipation of bonds, and to provide for the payment of the bonds or other indebtedness, and the costs and expenses of the maintenance of the sewerage system authorized to be constructed by the commissioners with the proceeds of the bonds sold.

Section 11 relates to the costs and expenses incurred for the purchase of land or rights in land, and for the construction of disposal works, pumping stations, sewers, administration expenses, &c., and for this purpose authorizes the commissioners to issue corporate bonds to an amount not exceeding $9,000,000, to be payable in not exceeding fifty years.

Section 12 authorizes the commissioners to borrow, in anticipation of the issuance of the bonds, not exceeding at any one time one-fifth of the estimated cost of the whole work, and to issue certificates of indebtedness or promissory notes therefor. This section also requires a sinking fund of not exceeding one per centum in any one year of the face value of the bonds issued.

Sections 13, 14, 15 and 16 relate to the method of discharging the indebtedness incurred under sections 11 and 12 of the act by its apportionment and assessment upon the several local municipal divisions within the boundaries of the Passaic Valley Sewerage District.

And section 17 directs that the local municipalities shall pay over the taxes assessed and collected to the treasurer of the Passaic Valley Sewerage District.

It is perfectly obvious from the terms of these sections that they relate to the internal affairs not only of the sewerage district but of *each of the several municipalities within the sewerage district*. By section 13 it is provided that all indebtedness, from any cause arising under the act, "shall be a charge upon all persons and property in the municipal or taxing districts lying in whole or in part within said sewerage district."

What is intended by this provision of the statute?

Apparently to charge upon each municipality within the sewerage district all indebtedness, to quote the language of the act, "as fully as the legislature of this state shall have power to authorize the same." The charging, it will be noticed, is proportionately upon the separate *municipalities* and not upon the sewerage district as such. Section 13.

By the stipulation in the cause it appears that the municipal or taxing districts, lying in whole or in part within the

Passaic Valley Sewerage District, are Paterson, Passaic, Acquackanonk, Franklin, Belleville, Garfield, Wallington, East Rutherford, Rutherford, Union township, North Arlington, Montclair, Glen Ridge, Bloomfield, Orange, East Orange, Kearney, East Newark, Harrison and Newark—twenty in all. The bond lien under the act is charged upon each of these municipalities as separate entities and not upon the sewerage district as a whole. Section 13.

Acts for the bonding of municipalities relate to the internal affairs of the municipalities. *Anderson v. Trenton,* 13 *Vroom* 486.

Suppose that the legislature had passed an act imposing upon these municipalities, by name, the burthen of this indebtedness. Would such an act have been a general law?

Would there have been any question but that it was a special act relating to certain specified municipalities?

Can the legislature create a district and appoint commissioners to incur indebtedness in that particular district by an act which relates to, and which can only relate to, that district, and therein enact that the several municipal subdivisions of such district shall be required to bear certain burthens? Is not that legislation as to their internal affairs, and is it not special? What is the difference between authorizing the commissioners, as agency of the state, to fix the indebtedness to be charged upon the municipalities, and the legislature itself doing it? Can the legislature make legislation general, when done through its agents, which would be special if done by itself?

The mere statement of the proposition refutes it.

Section 14 makes it perfectly clear that the whole scope and purpose of the debt-paying sections of the act of 1903 was to impose the taxes to pay the debts upon the several municipalities within the sewerage district, and to impose them upon the municipalities, as such, and not to impose the taxation upon the sewerage district, as such.

By this last section it is made the duty of the commissioners to *apportion* the indebtedness, sinking fund and other charges for each fiscal year "among the respective municipali-

ties and taxing districts lying in whole or in part within said sewerage district" according to the ratables in each; and section 16 of the act declares that on or before June 20th of each year, "the commissioners shall order and cause a tax to be levied and assessed upon all persons and property within *each* of the municipal and taxing districts lying in whole or in part within said sewerage district," to raise the money to pay such bond and sinking fund charges.

By section 15, the same method is provided for raising the money for operating and maintenance expenses.

Upon such apportionment being ascertained and fixed, it is declared that the sewerage commissioners shall "certify to the assessor, taxing board or taxing officer of *each of said municipalities* or taxing districts lying in whole or in part within said sewerage district the amount of tax required to be *levied, assessed and raised* in each of their respective municipalities and taxing districts for said purposes." *Pamph. L.* 1903, *p.* 169, § 16.

It is quite clear that an act which would authorize certain municipalities (naming them) to raise money in the way this act requires that they shall, would be a special act regulating the internal affairs of such municipalities, and would be void.

There is no peculiar feature, in the subject-matter of this legislation, applicable to these municipalities situated upon the Passaic river which would not be equally applicable to other municipalities similarly situated upon any other river or stream in the state.

An act allowing municipalities upon tidewater to do certain things only possible to tidewater conditions, would no doubt be general.

So an act allowing municipalities lying upon the rivers or streams of this state to do certain things, which only municipalities situated as they are could do, would no doubt be constitutional. But would an act allowing municipalities upon the Passaic river to do certain acts be general if there were no reason why such an act would not apply with equal benefit to municipalities similarly situated upon the Delaware or the Raritan?

It should be made clear, at this point, that I am not diverging from the doctrine declared in a number of cases —that it is within the power of the legislature to define, or to authorize local municipalities to define, taxing districts in which *the people may impose taxes upon themselves*—but in order to make such legislation valid it will appear from all the cases that the act under which it is permitted must be a general law, and one which is applicable to the whole of the class covered by the statute. Such a power could not be conferred upon one city or borough, or town or sewerage district, out of a class of such municipalities.

Such a law is general only when it authorizes all cities or boroughs, or townships or other municipalities, covering a constitutional class, to do certain acts relative to municipal affairs, in districts. *Allison* v. *Corker,* 38 *Vroom* 596.

When, therefore, the legislature confers this power upon sewerage districts, it must confer it upon the *genus,* and not upon one of the *species.* The act must embrace all to which it can equally apply and exclude none.

If sewerage districts can be created with appropriate characteristics to constitute a class for municipal legislation, then legislation applicable to all of the class is general and valid. *Hammer* v. *Richards,* 15 *Vroom* 667; *Johnson* v. *Asbury Park,* 29 *Id.* 604; *Anderson* v. *Trenton, supra; Hermann* v. *Guttenberg,* 34 *Vroom* 616.

But the legislature cannot set up one such district and legislate as to its internal affairs *eo nomine.*

Whether, therefore, you look at this statute as authorizing the Passaic Valley Sewerage District Commissioners to issue bonds, or as one charging the payment of the bonds, proportionately, upon the separate municipalities or taxing districts lying in whole or in part within the sewerage district, it is equally unconstitutional.

As to the sewerage district it is a special act, as by its terms it applies solely to the Passaic Valley Sewerage District, a single municipality. As to the separate municipalities within the said sewerage district it is a special act, because it applies to them and regulates their internal affairs for the

purpose of taxation, not as a constitutional class of municipalities, but as a part only of several classes, not embracing the whole of any class.

For another reason I think this statute is also unconstitutional.

The Court of Errors and Appeals of this state, speaking by Mr. Justice Depue, has declared: "Except as the legislature of the state may confer upon political divisions powers to legislate and to provide revenue for defraying the expenses of the local governments, it has no power to delegate the' power of taxation to municipal officers, or to another department of the government." *Township of Bernards* v. *Allen,* 32 *Vroom* 228.

The most vital principle of all free government is rested upon this doctrine.

If sewerage districts may be created with commissioners having authority to regulate, control, and fix the amount of tax necessary to construct and maintain sewers, without any right in the people to vote upon the amount to be levied, why not police districts, with police commissioners to control that power, to employ a force and direct what tax shall be levied in each of the municipalities within the police districts to maintain the police force?

Judge Cooley, in his work on *Taxation,* at *p.* 48 (1876), says:

"The power to impose taxes, like any other branch of the legislative authority, must be exercised by the legislature itself and cannot be delegated to municipal officers or even to another department of government. This is a principle which pervades our whole political system, and, when properly understood, admits of no exception. The people create a legislative department for the exercise of the legislative power, and they vest it with no authority to relieve itself of the responsibility by a substitution of other agencies."

At another point, in the same connection, this learned author states that there is one clearly defined exception to this general rule existing in the case of municipal corporations in the levy and collection of taxes for local purposes.

This arises from immemorial custom, which tacitly or expressly has been incorporated in state constitutions, and which has made such municipal governments practically a part of the general machinery of the state government. Whenever these agencies are a political division of the state, they may have conferred upon them powers of taxation through their local legislative bodies for local purposes.

The same principle as that enunciated by Mr. Cooley will be found in *Boroughs on Taxation,* ch. 11 (1877), and the rule is there stated this way:

"No tax can be levied without the authority of the legislature of the state. The power to tax is vested in this branch of the government. This power is exercised either directly by the legislature or indirectly, as in the cases where it is, delegated to subordinate political divisions of the state, such as counties or cities."

In 27 *Am. & Eng. Encycl. L.* 619, *tit. "Taxation,"* the rule is stated this wise:

"Legislative power has by the constitution been committed to the legislature as a distinct department of government. Such power cannot be delegated by the legislature to any other department of the government or to any citizen or citizens in either a private or official capacity. It is accordingly held that the power of taxation cannot be delegated to the judicial department, to municipal or administrative officers, or to individuals, or private corporations."

This brings us to the question of whether the statute under review confers upon the Passaic Valley Sewerage Commissioners power to levy taxes, vesting in them the right to fix the amount of the tax and to direct the levy thereof.

It would seem impossible to give any other construction to the statute upon a consideration of its most plain terms.

The commissioners are authorized to incur obligations, issue bonds, and otherwise incur indebtedness, and by the fourteenth and fifteenth sections they are to determine, on

the 15th of June of each year, the amount of money necessary to be raised for the payment of interest, sinking · fund and maintenance expenses for the current fiscal year; and by the sixteenth section it is enacted that "the said board of sewerage commissioners shall, on or before the twentieth day of June in each year, *order and cause a tax to be levied and assessed* upon all persons and property within each of the municipal and taxing districts lying in whole or in part within said sewerage district, for the purpose of raising the money necessary to pay interest upon its bonds and for other indebtedness and sinking fund charges, and for the sum or sums of money estimated as necessary to provide for the proper maintenance and operation of its works and plant and for all other expenses of said sewerage commissioners."

This section then proceeds to give details.

This statute is too clear for construction; it interprets itself.

These commissioners are certainly municipal or administrative officers; they are not representative of the people, and under our form of government the right to levy taxes is inherent in the people, through the legislature or through local political divisions, such as counties and cities, self-governing.

Hitherto, in considering this case, I have treated the "Passaic Valley Sewerage Commissioners" as a municipal or *quasi*-municipal corporation, and the result so far reached has been upon the basis that it was such, and the purpose has been to show that even if it were, the act is unconstitutional for the reasons hereinbefore stated; but a careful review of this statute convinces me that the Passaic Valley Sewerage District is not a political division of the state in the sense of a municipality (the majority opinion, I think, concedes this), and if it be not, the rule of law applicable to this district on the question of taxation is very well settled, at least in this court, in this state.

The decisions in New Jersey on this subject are gathered together in 27 *Am. & Eng. Encycl. L.* (at *p.* 621), and the principle declared in them is there stated as follows:  "The

legislature has full power, unless restricted by the constitution, to create political divisions of the state for the purposes of taxation, but it cannot establish a taxing district within an existing political corporation or division of the state in which to impose taxes without regard to the special benefits, unless such district is itself made a *political division with appropriate powers of self-government."*

The district here created is unquestionably created for a specific purpose, and is defined as a sewerage district. It is not a political division of the state with any power of *local self-government,* or any other kind of self-government; its government, and the imposition of taxes, in so far as either is conferred, is cast upon a commission appointed by the governor.

True, the sewerage district is composed of many political divisions, the identity of each being maintained and reserved, and the entire territory of each being included within the district, save in one or two cases; but the rule stated above as embodying the principle of the decisions of this state, as I understand it, not only applies where a district lies within a township, but where a district embraces a part of a county or other political division of the state, or where a district is not itself made a political division of the state with powers of local government.

The Passaic Valley Sewerage District is composed of parts of four separate counties, and of more than one municipality in each of the counties, and hence embraces parts of four separate political divisions, namely, counties, which have the powers of taxation for local purposes under our form of government, as declared by Mr. Justice Depue in the Bernards township case.

That this district as created could have conferred upon it, under its present form, the right to impose burdens upon the property in the district for special benefits, is well settled; but to impose such burdens by the levying of a tax through a commission appointed as this one is, and not through a representative political government, is against a long series of decisions in this court and contrary to every principle of

constitutional taxation. *Baldwin* v. *Fuller,* 10 *Vroom* 576; *S. C. affirmed,* 11 *Id.* 615; *Lydecker* v. *Englewood,* 12 *Id.* 154; *Vreeland* v. *Jersey City,* 14 *Id.* 135; *Auryansen* v. *Hackensack Improvement Commission,* 16 *Id.* 113; *Peck* v. *Township of Raritan,* 23 *Id.* 319; *Carter* v. *Wade,* 30 *Id.* 119.

In *Lydecker* v. *Englewood, supra,* Mr. Justice Dixon declares: "The political divisions of the state are those which are formed for the more effectual or convenient exercise of political power within the particular localities. Originally counties and townships, in which a uniform state policy is observable, composed this class almost or quite exclusively; then, as population became denser in certain places and there was added to this common design a special necessity for local government different from that appropriate to more rural districts, villages, towns and cities were constituted. * * * They also became political divisions. In these institutions, therefore, must be discovered the essential characteristics of their class, and they will be such common and prominent features as have co-existed with these organizations throughout their history and are not possessed by other bodies of legislative creation, which stand outside of the same category. These distinctive marks are, I think, that they embrace a certain territory, and its inhabitants organized for the public advantage, and not in the interest of particular individuals or classes; that their chief design is the exercise of governmental functions, and that to the electors residing within each is to some extent committed the power of local government, to be wielded either mediately or immediately within their territory for the peculiar benefit of the people there residing. ·

In *Auryansen* v. *Hackensack Improvement Commission, supra,* Justice Reed declares: "The taxing district, as we have stated, is not co-extensive with any township, and therefore, unless the legislature has conferred upon the taxing district itself such powers of local government as to impart to it a political character, the tax must fall, as its imposition is obnoxious to the rule promulgated in *Baldwin* v. *Fuller,* 10 *Vroom* 576."

In *Peck* v. *Township of Raritan, supra,* Justice Magie declares: "The first question presented, therefore, is whether the districts authorized by this act are made political corporations or divisions of the state. That they occupy an area within and less than the township will not answer this question, because dual governments with distinct functions may co-exist. But in any such case the included organization must have a public character and be endowed with *some powers of local government.* I think it plain that no such organization was designed to be established by this act. The district is not given power to elect officers to act for it."

Without further quotations from the above citations, enough has already been said to make it clear that a district created by legislation which does not have in it, to some extent, *elements of local government committed to the electors residing therein,* cannot be a political division. Only political divisions having representative forms of government can levy taxes.

I think, also, that the other objection raised to the act, namely, that it offends against that other clause in paragraph 11 of section 7 of article 4 of the constitution, which inhibits special legislation "appointing local officers or commissioners to regulate municipal affairs," is well founded.

By section 1 of the act the governor is authorized to appoint the commissioners of the "Passaic Valley Sewerage District" as their terms of office expire, and the commissioners appointed under chapter 49 of the laws of 1902, *supra,* are continued in office not only until the expiration of their terms, but until the first Tuesday in May next succeeding the expiration of their terms.

An act which continues in office all officials in the whole of a constitutional class of municipalities is constitutional, as was held in *Boorum* v. *Connelly,* 37 *Vroom* 197. But such an act, if applied to a single city of the class would not be constitutional. So, upon principle, it may be that a general law, authorizing the governor to appoint commissioners for certain governmental or departmental purposes in cities or in other constitutional classes of municipalities,

would be constitutional; but such an act, if it only applied to one city or other municipality of a class, would not be constitutional, and it seems to me that an act which confers authority upon the governor to appoint commissioners in a certain specified sewerage district is a special law for the appointment of local officers or commissioners to regulate municipal affairs, and is void.

It was also contended upon the argument that the act of April 22d, 1903, was a special act, conferring corporate powers, and hence in conflict with the last clause of paragraph 11 of section 7 of article 4 of our state constitution, which declares "the legislature shall pass no special act conferring corporate powers." Whether this provision of the constitution is applicable depends upon what character of a corporation the "Passaic Valley Sewerage Commissioners" is. If it is a municipal corporation, then this provision of the constitution does not apply, as, in *Pell* v. *Newark, supra,* it was expressly held that a municipal corporation may be created by special act. But, if it is not a municipal corporation, as the majority opinion seems clearly to hold, then it seems impossible to escape the conclusion that the act of April 22d, 1903, is avoided by the constitutional inhibition against conferring corporate powers by special act. That the Passaic Valley Sewerage Commissioners are created a corporation, and have conferred upon them corporate powers, is too clear for discussion. It is only necessary to read section 3 of the act creating them to establish this fact. *Pamph. L.* 1903, *p.* 780.

That the act is special *in its conference of corporate powers* cannot be doubted. It is of little concern, therefore, in the view I take, whether it is or is not a municipal corporation. If it is, I think I have shown it to be a special act regulating municipal affairs. If it is not municipal then what is it, if not a special act conferring corporate powers?

Two other grounds of objection were urged upon the hearing against the validity of this law.

*First.* That it provides a scheme of taxation which is not uniform over the whole area affected.

*Second.* That the method of apportioning the tax is arbitrary, inequitable and unjust, and not based upon any consideration of the special benefits accruing to individuals or localities.

Whether this act is void for either of these reasons is of little concern, as I think it void for the other reasons given, and as they go to the avoidance of the whole statute, other valid objections, if they exist, need not be pointed out, as such labor would answer no useful purpose.

In reaching this conclusion I am not unmindful of the fact, urged by counsel on the argument, that the statute under review is claimed to be one of great public benefit; but that fact, if conceded, cannot change the obligation of a court under its imperative duty to declare legislation void which is inimical to constitutional restrictions. No legislation can be deemed by the court to be beneficial to the public if in conflict with the constitution which the people have adopted for themselves.

In my view the act of April 22d, 1903, is unconstitutional, and the resolution brought up by the writ in this case should be set aside.